[Civ. Nos. 24553, 25160.    First Dist., Div. Four.    Oct. 27, 1969.]

IDA KNOFF et al., Plaintiffs and Respondents, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants.

(Two Cases.)

## COUNSEL

Thomas M. O'Connor, City Attorney, and George E. Baglin, Deputy City Attorney, for Defendants and Appellants.

Chickering & Gregory, John P. MacMeeken, Orrick, Herrington, Rowley & Sutcliffe, James K. Haynes, Bronson, Bronson & McKinnon, Max Weingarten, Richard L. Greene, Ehrlich & Allison, Philip S. Ehrlich, Jr., Irving Rovens, Cushing, Cullinan, Hancock & Rothert, Vincent Cullinan and Stephen H. Slabach as Amici Curiae on behalf of Defendants and Appellants in Civ. No. 24553.

Johnston, Platt, Klein & Horton, Robert D. Platt and V. Judson Klein as Amici Curiae on behalf of Defendants and Appellants in Civ. Nos. 24553 and 25160.

Lowenthal & Lowenthal, Morris Lowenthal, Jerome N. Field and Thorpe & Cummings for Plaintiffs and Respondents.

## OPINION

**RATTIGAN, Acting P. J.**—In 1965, an extensive investigation by the grand jury for the City and County of San Francisco resulted in the indictment of Russell L. Wolden, the assessor thereof, on multiple counts charging his criminal misconduct in office. Four San Francisco taxpayers thereafter commenced this action in the form of a taxpayers' suit against the City and County, its board of supervisors (as such and as the board of equalization), and against Wolden as the assessor, seeking a writ of mandate to require official action addressed to the situation brought about by Wolden's activities in office as disclosed by the grand jury investigation. In 1 Civil 24553, defendants[1] appeal from a judgment directing issuance

---

[1] In the conventional nomenclature of mandamus, the parties sued were "respondents" in the trial court. As it is they who have taken the various appeals, the original petitioners are "respondents" in this court. To avoid confusion in this regard, we herein refer to the parties originally sued as "defendants" or "appellants," and to the original petitioners for writ of mandate as "petitioners."

of a writ of mandate substantially as prayed (hereinafter the "main judgment"), from a judgment awarding petitioners their attorneys' fees, and other orders. In 1 Civil 25160, defendants appeal from an order which was entered after the main judgment and which spelled out certain specific standards to be followed by defendants in complying with the peremptory writ of mandate issued pursuant thereto.[2]

On both appeals, the parties have literally inundated this court with written arguments (their printed briefs, with appendices, run to `an aggregate length of 1,500 pages) whose sheer volume will require extensive discussion on the appeals' merits. Despite this prospect, we first find it necessary—because the remedy successfully exercised by petitioners is novel both in concept and application—to describe the action and the main judgment in some detail.

The trial court entered the main judgment as a judgment on the pleadings. The latter (the petition for writ of mandate and an answer thereto filed by the City and County and by its respective boards) are too long and complicated[3] to permit summarizing them here and, as will appear, this is not necessary. We note at this point, however, that the petition set forth these pertinent allegations among others:

Each of the four petitioners was a "citizen resident" of San Francisco and the owner of property therein which, during the three years preceding commencement of the action, had been annually assessed by the assessor thereof and upon which each had paid the property taxes "so assessed." The assessor during said period was Russell L. Wolden, upon whom various constitutional and statutory provisions imposed certain specified duties.

The petition further alleged the fact of the 1965 investigation of Wolden by the grand jury (referring to it by the grand jury's title of "In the Matter of the Investigation of Russell L. Wolden"); that the grand jury had received therein "sworn testimony of 25 witnesses, . . . which testimony is reflected" in a 750-page grand jury transcript; and that, acting upon such testimony, the grand jury had indicted Wolden on "ten counts of bribery and one count of conspiracy."[4]

---

[2] The two appeals (1 Civil 24553 and 1 Civil 25160) have heretofore been consolidated by order of this court.

[3] The petition alleged three causes of action and an elaborate prayer. The answer pleaded admissions, denials, other matters and 12 separate affirmative defenses. Between them, the petition and answer fill 95 pages of the 1,200-page clerk's transcript on appeal.

[4] In connection with Wolden's indictment as thus alleged in the petition for writ of mandate, other sources in the record or within our notice establish the following facts: He was indicted on October 10, 1965, on ten counts of accepting bribes (Pen. Code, § 68) and one count of conspiracy (Pen. Code, § 182) to accept bribes. His trial on these charges commenced on February 21, 1966 (two days before petitioners'

The petition incorporated the 1965 grand jury transcript by reference. This was followed by extensive allegations which were explicitly "based upon" the grand jury testimony (in effect, they summarized it), and which recounted a course of conduct by Wolden, as the San Francisco assessor, wherein he accorded preferential assessment treatment to certain property taxpayers who bribed him to do so.[5]

The petition for writ of mandate was filed on February 23, 1966. In response thereto and on the same day, the trial court issued an alternative writ of mandate directed to the various defendants and returnable on March 7. Prior to the return date, the City and County and the two boards (i.e., the board of supervisors as such and as the board of equalization) filed (1) a written objection to "any offer, and to the receipt, in evidence" of the 1965 grand jury transcript, upon the ground that it contained "inadmissible hearsay"; (2) a general demurrer to the petition for writ of mandate; (3) notice of a motion to strike those portions thereof which incorporated the 1965 grand jury transcript and which alleged Wolden's misconduct based upon the transcript's contents; and (4) their answer to the petition. Wolden did not join in these pleadings, nor did he personally plead in the action at any time.[6]

---

action was filed). He was convicted, on all counts, on May 28, 1966, and was removed from office forthwith The conviction was affirmed on appeal in 1967 and became final in 1968. (*People* v. *Wolden* (1967) 255 Cal.App.2d 798, 806 [63 Cal.Rptr. 467], hearing denied January 3, 1968.)

[5]In these respects, petitioners generally alleged that "in derogation" of their rights and the rights of "all other taxpayers of San Francisco," Wolden had breached his public trust as assessor by making "arbitrary, fraudulent and dishonest assessments" from which he realized "unauthorized profit out of the public business entrusted . . . to his care" by accepting bribes.

Somewhat more specifically, they next alleged that Wolden had failed to perform his duty of identifying and assessing, at its proper value, all property subject to assessment in San Francisco; that he had permitted his bribers to omit reporting taxable property to him, or to report such property at falsely low values which resulted in its nonassessment or underassessment; that he had permitted and encouraged the employees in his office to act similarly; and that he had "applied," to property owned by his bribers, a "preferentially lower assessment ratio than that applied to property in the same class" owned by others.

Finally and most specifically (and recounting details of the 1965 grand jury testimony incorporated in the petition by reference), petitioners alleged instances in which Wolden had accorded preferential treatment to taxpayers who had bribed him. These allegations included the names of the persons who had given bribes, the dates of the transactions, the nature and amounts of the bribes, and the assessment or other figures involved. The preferential treatment given to these persons was alleged to have consisted of specific actions on Wolden's part: e.g., permitting the favored taxpayer to "escape assessments" through failure to report equipment and inventories, reducing the taxpayer's "assessment ratio" by and to specified percentages of the real value of the property involved, reducing assessed valuations outright, and settling deficiency assessments for improperly low cash amounts.

[6]As we hereinafter hold, Wolden appeared in the action on March 7, 1966. Following his removal from office (see fn. 4, *ante*), Joseph E. Tinney was appointed to the

At several hearings (commencing on the March 7 return date), the trial court, among other things, denied a motion for continuance of the cause until after Wolden's then-pending criminal prosecution had been concluded; overruled the general demurrer to the petition; and denied the motion to strike those portions thereof which incorporated the 1965 grand jury transcript and reiterated its contents. The court finally stated that, in its view, the material allegations of the petition had been admitted by the answering defendants; that the court would therefore enter judgment on the pleadings ordering issuance of a peremptory writ of mandate as prayed; and that it would retain jurisdiction of the cause. These proceedings were followed by entry of the main judgment, and issuance of the peremptory writ of mandate pursuant thereto, on March 28, 1966.

### The Main Judgment

In the main judgment the trial court made detailed "determinations" which included both findings of material fact[7] and recitals of matters of law. In them, the court accurately summarized the material allegations of the petition which had not been denied by the answering defendants; for this reason, and because we hereinafter recite the substance of the "determinations," we need not summarize the pleadings.

Under "determinations" sounding in terms of fact, the judgment stated that the grand jury investigation of Wolden had occurred in 1965; that the transcript thereof, as incorporated in the petition by reference, contained "reasonable information" which showed that the City and County had lost property tax revenues because of unassessed or underassessed properties; that such information constituted reasonable cause for an immediate "investigation, inquiry and examination" to be made by the board of supervisors, with the cooperation of the assessor's office and with the assistance of experts to be employed by the board, of "properties of San Francisco taxpayers" which may have been improperly underassessed or not assessed; and that such project would, in reasonable probability, "lead to the discovery of substantial escaped assessments and properties which have escaped assessment."

In other "determinations," the judgment stated that none of the defendants, despite proper demands made upon them, had acted in the situation at hand; that the reason for inaction by the City and County and the board of supervisors, as asserted by their counsel[8] (that they desired to await the

---

office on May 31, 1966. Tinney, as assessor, was substituted for Wolden as a party to the action by order of the trial court made July 12, 1966. As assessor, he is also an appellant in 1 Civil 24553.

[7] Separate findings of fact were not made as such.

[8] The "counsel" here mentioned is the City Attorney for the City and County of San Francisco, who represents appellants on these appeals. We hereinafter refer to him on occasion as "the city attorney."

conclusion of Wolden's criminal prosecution so as not to prejudge his guilt of the crimes charged therein), did not justify delay; that, because of the commencement of the new assessment year on March 7, 1966 (the current lien date), and applicable statutes of limitation, the City and County had already suffered "irreparable loss" from such inaction to date; and that the assessor's present engagement in the assessment of personal property, and the impending function of the board of supervisiors as a board of equalization in July 1966, required that an "investigation, examination and inquiry" commence forthwith.

Following these "determinations" (and those reciting matters of law relative to the duties of the public officers involved, which we hereinafter discuss), the judgment ordered that a peremptory writ of mandate issue; that the trial court retained jurisdiction of the cause and jurisdiction to modify the peremptory writ upon noticed request by the petitioners; and that defendants report to the court, at specified intervals, concerning the steps being taken to comply with the peremptory writ. The judgment also awarded petitioners "reasonable attorneys' fees" in the action, the amount thereof to be subsequently fixed as hereinafter discussed.

The peremptory writ of mandate, issued pursuant to the judgment, was addressed to each of the defendants and followed the judgment in close detail. All defendants were ordered to take all appropriate action "commanded herein and called for" by the information contained in the 1965 grand jury transcript. The board of supervisors was ordered to initiate, immediately, a "full investigation, inquiry and examination into the matter of loss by . . . [the City and County] . . . of property tax revenues during this or any prior assessment year" as to which such recovery was permitted by law.

The writ further ordered the board of supervisors to conduct the project, in cooperation with the assessor and his office but "through" independent experts ("auditiors, appraisers and certified public accountants"). The experts were to be employed by the board for the purpose of identifying taxable properties which had not been assessed, or which had been underassessed or had "otherwise escaped taxation for any reason," due to the assessor having applied an improperly low assessment ratio, inaccurate reporting of cost or value by a taxpayer, misuse of cost or value figures (accurately reported or not) by the assessor; and the fixing of improperly low assessed valuations by the assessor pursuant to "arrangement" with him or with anyone employed in his office. The experts were to make a full "audit or re-audit" and "appraisal or re-appraisal" of property which, there was reasonable cause to believe, had escaped taxation by reason of any of the just-mentioned acts or omissions.

The assessor and the board of equalization were ordered to take

appropriate action to identify the property in question, to make new assessments as authorized by law (including penal assessments); to make appropriate changes in the assessment roll (the board of equalization was specifically ordered to direct the assessor to do this); and to recover any property taxes owing the City and County, with appropriate penalties authorized by law. The assessor was ordered to cooperate with the board of supervisors in the investigation and to give its experts full access to all information in his possession.

### The Appeal From The Main Judgment
### (1 Civil 24553)

On the appeal from the main judgment, we categorize appellants' principal arguments (which they present under 19 separate headings) as contending (1) that the remedy of mandamus did not lie in principle; (2) that petitioners could not exercise it, as such or in the form of a taxpayers' suit; (3) that it could not be exercised without exhausting precedent administrative remedies; (4) that the trial court committed various procedural errors; and (5) that the main judgment is erroneous in content. None of these arguments can be sustained; we affirm the judgment.

### Mandamus Was The Proper Remedy

The propriety of mandamus as petitioners' remedy rests upon the trial court's "determinations" reciting, in the judgment, matters of law relative to the public duties imposed by law upon the assessor, the board of supervisors and the board of equalization. We uphold these determinations (as pertinent, and referring to each by paraphrasing it or by quoting it in part) as follows:

As to the assessor, the trial court first determined that he "is required faithfully to comply with all duties imposed upon him under the revenue laws." The statement recited a truism whose manifest correctness requires neither discussion nor supporting authority.

In the same context, the court determined that the assessor is under a duty "not to allow anyone to escape a just and equal assessment through favor, reward or otherwise." This statement primarily defines the assessor's duties (1) to assess *all* property in his jurisdiction and (2) to do so *on a uniform basis.* The statement was correct in both respects. The Constitution requires that "*All* property subject to taxation shall be assessed at its full cash value." (Cal. Const., art. XI, § 12 [italics added].) The duty to do this lies with the assessor. (Rev. & Tax. Code,[9] § 405; *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.

---

[9]Several sections of the Revenue and Taxation Code cited herein were affected by statutory revision in 1966 (Stats. 1966, First Ex. Sess., ch. 147, p. 648) or in 1967. (Stats. 1967, ch. 1418, p. 3336.) The earliest effective date of any provision of the

Rptr. 609, 428 P.2d 593].) While the courts have interpreted the constitutional mandate as permitting him (the assessor) to assess taxable property at a fraction of its true market value (see, e.g., *County of Sacramento v. Hickman, supra,* at p. 851), the decisions impose upon him the duty to apply a fractional evaluation standard *uniformly* within his county. (*County of Sacramento v. Hickman, supra,* at p. 851; *Michels v. Watson* (1964) 229 Cal.App.2d 404, 413 [40 Cal.Rptr. 464]. See *Hanks v. State Board of Equalization* (1964) 229 Cal.App.2d 427, 430-431 [40 Cal.Rptr. 478].) That he is under this duty necessarily means that he is obligated "not to allow anyone to escape a just and equal assessment through favor, reward or otherwise."

■  Moreover, the same statement—relative to the assessor's duty "not to allow anyone to escape" assessment—correctly bespeaks his statutory obligation to assess, upon discovery, "property belonging on the local roll [which] has escaped assessment." (Rev. & Tax. Code, §§ 531, 533-534.) The trial court also correctly determined in the judgment that the assessor must "penally assess, on discovery, any property willfully or fraudulently concealed to evade taxation." (See Rev. & Tax. Code, §§ 503-505.)

■  Concerning the pertinent duties of the board of supervisors, the trial court determined that the board had "the duty . . . to supervise the official conduct of the Assessor to the extent of requiring him faithfully to discharge his duties under the law." The duties of a board of supervisors are as the Legislature "shall prescribe." (Cal. Const., art. XI, § 5.) The trial court's language correctly stated one such duty as prescribed by the Legislature—with emphasis as to the assessor—in Government Code section 25303.[10]

■  The trial court also determined in broad terms that the assessor and the board of supervisors, holding "positions of public trust," had "an active duty to take timely and appropriate action, . . . through inquiry, examination and investigation respecting, and through undertaking recovery of, any uncollected property tax revenues" which had not been paid to the City and County due to the actions or omissions of a taxpayer or public officer thereof; and that these duties specifically required performance "[w]herever reasonable information shows probable or reasonable

1966 enactment was October 6, 1966 (see Stats. 1966, p. A-3), and several of its provisions took effect thereafter. (See *id.,* ch. 147, § 103, p. 683.) This action was filed on February 23, 1966; the main judgment was entered on March 28, 1966. Accordingly (and unless otherwise indicated), each citation of said code refers to the pre-1966 version of the section cited.

[10]As pertinent, section 25303 provides that "The board of supervisors *shall* supervise the official conduct of all county officers, . . . and *particularly* those charged with the *assessing* . . . of the public revenues. It shall see that they faithfully perform their duties, . . . and when necessary, require them to . . . make reports and present their books and accounts for inspection." (Italics added.)

cause for an investigation . . . respecting the loss of property tax revenues, . . . or shows the reasonable probability that there has been such a loss." The first statement correctly defined a necessary dimension of the previously described duties of the assessor and the board concerning property tax revenues (i.e., to pursue and remedy the consequences of dereliction). The second, saying in effect that public officers must respond to duty when reasonably called upon, recites another truism which requires no elaboration.

■ As used in the constitutional and statutory provisions just cited relative to the public duties involved (Cal.Const., art. XI, § 12; Rev. & Tax. Code, §§ 405, 531, 533-534, 503-505; Gov. Code, § 25303), the word "shall" must be construed as mandatory because of the constitutional and legislative purposes patently appearing therein, the public policy considerations involved (relative to the public revenue), and the context in which the word appears in each instance. (See *Francis* v. *Superior Court* (1953) 3 Cal.2d 19, 28-29 [43 P.2d 300]; *People* v. *Municipal Court* (1956) 145 Cal.App.2d 767, 775-776 [303 P.2d 375]. See also Rev. & Tax. Code, § 16; Gov. Code, § 14.) The law, thus, "specially enjoins" the public duties determined by the trial court to exist, which means that the remedy of mandamus lies to compel their performance. (Code Civ. Proc., § 1085;[11] *Gogerty* v. *Coachella Valley Jr. College Dist.* (1962) 57 Cal.2d 727, 730 [21 Cal.Rptr. 806, 371 P.2d 582] and cases cited; *Fuller* v. *San Bernardino Valley Municipal Water Dist.* (1966) 242 Cal.App.2d 52, 57 [51 Cal.Rptr. 120]; *Lagiss* v. *County of Contra Costa* (1963) 223 Cal.App.2d 77, 92 [35 Cal.Rptr. 450].)

■ While it is true that mandamus will not lie to "control" the exercise of administrative discretion (*City & County of San Francisco* v. *Superior Court* (1959) 53 Cal.2d 236, 245 [1 Cal.Rptr. 158, 347 P.2d 294]; *Gong* v. *City of Fremont* (1967) 250 Cal.App.2d 568, 572 [58 Cal.Rptr. 664]), this action did not seek that result and the judgment did not order it. The judgment is explicit in terms of the steps to be taken by the public officers it reached, the objectives to be pursued, and the methods to be used, but it directs no specific result as to any individual assessments or taxpayers. The results to be realized will depend upon the assessor's or the board's discretion *when exercised*. The action is therefore within the rule that, "[w]hile ordinarily, mandamus may not be available to compel the exercise by a court or officer of the discretion possessed by them in a particular manner . . . it does lie to command the exercise of discretion —to compel some action upon the subject involved. [Citations.]" (*Hollman* v. *Warren* (1948) 32 Cal.2d 351, 353 [196 P.2d 562]. See *Browning* v. *Dow* (1923) 60 Cal.App. 680, 682 [213 P. 707].)

---

[11]As pertinent, section 1085 provides that ". . . [A writ of mandate] . . . may be issued . . . by any court to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust or station; . . ."

### Petitioners' Standing To Bring Mandamus In A Taxpayers' Suit

On this subject, and as pertinent, the trial court determined in the judgment that "This is a public taxpayers' action filed by petitioners on their behalf and on behalf of all other citizen-resident taxpayers of San Francisco, in aid of the collection of taxes . . . ." This statement, which reached petitioners' standing both (1) to sue in mandamus and (2) to do so in the form of a taxpayers' suit, was correct in both respects. One who will be "beneficially interested" thereby may petition for a writ of mandate. (Code Civ. Proc., § 1086; *Fuller* v. *San Bernardino Valley Municipal Water Dist., supra,* 242 Cal.App.2d 52, 56.) Petitioners' status as San Francisco taxpayers made them "beneficially interested" parties who could maintain this action because (as we have seen) its object was to compel the performance of public duties which the law specially enjoins. (Code Civ. Proc., § 1085; *Gogerty* v. *Coachella Valley Jr. College Dist., supra,* 57 Cal.2d·727 at p. 730 and cases cited; *Fuller* v. *San Bernardino Valley Municipal Water Dist., supra,* at pp. 57-58; *Lagiss* v. *County of Contra Costa, supra,* 223 Cal.App.2d 77 at p. 92.) For the same reasons, they brought the action in a representative capacity (*Gogerty* v. *Coachella Valley Jr. College Dist., supra*), which made it a class action. The trial court, therefore, correctly determined that they sued "on behalf of all other citizen-resident taxpayers of San Francisco" as well as on their own behalf.

Appellants contend that the action was not maintained on behalf of "all taxpayers" because some of them (i.e., those who had previously received preferential treatment from Wolden and who might now be brought to ·book) will not be benefitted by it. But the purpose of the action and of the writ of mandate is to achieve uniformity of treatment of all taxpayers at the assessor's hands, and this prospect is one of its reasonably predictable results. Those taxpayers previously favored by Wolden, among all San Francisco taxpayers, will share in the public benefits to be realized from that objective; and this fact is not negated by the detail that some might be required to pay property taxes which they rightfully owed in the first instance. The action was therefore on behalf of "all taxpayers."

### Administrative Remedies

The trial court further determined that "it was not a condition to the filing of this action, and there is no need, that petitioners exhaust any administrative remedies," and that no such precedent remedy "was or is available . . . to afford relief on the subject of this proceeding." Challenging this conclusion, appellants invoke "the general rule that a taxpayer seeking relief from an erroneous assessment must have exhausted his remedies before the administrative body empowered initially to correct the error· [i.e., the board of equalization]." (*Security-First Nat. Bank* v.

*County of Los Angeles* (1950) 35 Cal.2d 319, 320 [217 P.2d 946]; *McCaslin* v. *DeCamp* (1967) 248 Cal.App.2d 13, 15 [56 Cal.Rptr. 42].)

The decisions applying the "general rule" involved actions in which taxpayers sought judicial relief from *specific* assessments of their own properties (see, e.g., *Security-First Nat. Bank* v. *County of Los Angeles, supra,* 35 Cal.2d 319 at p. 320; *McCaslin* v. *DeCamp, supra,* 248 Cal.App. 2d 13 at pp. 14-15; *Los Angeles etc. Co.* v. *County of Los Angeles* (1912) 162 Cal. 164, 165-166 [121 P. 384, 9 A.L.R. 1277]) or of properties owned by others. (See, e.g., *Clunie* v. *Siebe* (1896) 112 Cal. 593, 594-595 [44 P. 1064].) (See, generally, cases cited in Early, *Local Equalization Practice in California* (1964) 4 Santa Clara Law. 147, 148-152.) In such an action, prior recourse to the board of equalization is properly required because the board, through the exercise of its statutory power to equalize assessments on the local roll by increasing or lowering some of them (Rev. & Tax. Code, § 1605), is the "administrative body empowered initially to correct the error." (*Security-First Nat. Bank* v. *County of Los Angeles, supra.*)

This is not such an action. Although the petition cites gross error in several individual assessments, it pleads them as symptomatic of the much broader problem the action is designed to relieve. The action's purpose is not to have these assessments, as such, changed: it is to bring about examination and correction of wholesale deficiencies in the San Francisco assessment situation which reasonably require, not the adjustment of some specific assessments or the recovery of taxes paid upon them, but the examination of all assessments and the adjustment of those which require such action and can legally be reached. As to the assessor, the action is addressed to the full dimensions of his public duties in office, not to isolated entries in the local assessment roll. As to the board of supervisors, the action invokes the board's duty to "supervise . . . [the assessor's] . . . official conduct." (Gov. Code, § 25303.) The local equalization procedure would not reach the real problem with the assessor, and it is not germane to the duties of the board of supervisors sitting as such. Accordingly, it is not a precedent administrative remedy to the action because the board of equalization is not an "administrative body empowered . . . to correct" the situation from which judicial relief is sought (*Security-First Nat. Bank* v. *County of Los Angeles, supra,* 35 Cal.2d 319 at pp. 320-321), and no prior administrative remedy is provided by law for this purpose. Therefore, the trial court's determination in these respects was correct.

### Claimed Procedural Errors

The trial court determined in the judgment that appellants' answer to the petition for writ of mandate (i.e., the answer filed thereto by the City

and County and its respective boards) "raised only questions of law, or put in issue immaterial statements not affecting the substantial rights of the parties or the gravamen . . . [of the action] . . ." Although we have not summarized the pleadings because of their length, we state here that we agree with this determination. The answer therefore stated no defense to the action; hence the trial court properly entered judgment on the pleadings. (See *MacIsaac* v. *Pozzo* (1945) 26 Cal.2d 809, 812-813 [161 P.2d 449].)

Because the pleadings joined no genuine issue of material fact, the trial court was not required to consider the evidentiary effect (if any) of various presumptions relative to the regularity of Wolden's conduct in office. (E.g., Code Civ. Proc., § 1963,[12] subd. 1 [presumption of innocence of crime or wrong]; see also *id.*, subds. 15, 33.) For the same reason, the court did not err in denying appellants any exercise of discovery rights pursuant to Code of Civil Procedure section 2030.

Appellants make several arguments to the effect that the trial court erred in examining the transcript of the grand jury's investigation of Wolden (which transcript was incorporated by reference in the petition for writ of mandate), and in considering its contents because such were hearsay evidence. They also contend that the petition's allegations relative to specific instances of misconduct by Wolden do not support the judgment because they were made "upon information and belief." Although the petition did not physically include the 750-page transcript, it alleged (1) the fact of the grand jury's investigation of Wolden, (2) the results thereof as indicated by Wolden's indictment upon "the sworn testimony of 25 witnesses," and (3) that the transcript was in existence as "a public document and public record." Appellants' answer (i.e., the answer filed by the City and County and by the respective boards) admitted the first two allegations explicitly, and admitted the third by not denying it. (Code Civ. Proc., § 462.)

The testimony received by the grand jury as recounted in the transcript, and the fact of Wolden's indictment pursuant thereto, were subjects of which the trial court could properly take judicial notice. (Code Civ. Proc., § 1875, subd. 3 [see fn. 12, *ante*]. See Pen. Code, § 938.1.) Because appellants admitted that the transcript was in existence as a public record, the trial court could therefore—as it did—take judicial notice of its contents by examining it.     Having done so, the court had reasonable cause to order the investigation and other actions determined in the judgment to be necessary. The transcript's contents were hearsay evidence in the literal sense, but the adequacy thereof to show "reasonable cause" is well settled. (See *People* v. *Boyles* (1955) 45 Cal.2d 652, 656 [290 P.2d

---

[12]The statute here cited was in effect when the first hearings commenced in this action (which was in 1966). (See Evid. Code, § 12, subds. (a), (b).)

535]. See also Witkin, Cal. Evidence (2d ed. 1966) Exclusion of Illegally Obtained Evidence, § 111, p. 110.) Having developed such reasonable cause from the grand jury transcript, the trial court did not rely upon the petition's allegations which, paraphrasing the transcript, were made upon information and belief. We therefore find it unnecessary to discuss appellants' arguments disparaging such allegations.

■ The trial court did not err in declining to postpone proceedings in petitioners' action until Wolden's criminal prosecution had been concluded. The court determined that the pleadings showed reasonable cause to order the actions spelled out in the judgment. Given such reasonable cause, the question of Wolden's guilt or innocence of specific crimes was irrelevant. The trial court was under no duty to defer proceedings in deference to Wolden's rights as a criminal defendant, and the actions ordered in the judgment were urgent in point of time and because of the commanding public interest in their subject matter.

■ Appellants complain of alleged irregularity in the service of process (i.e., of the trial court's alternative writ of mandate) upon Wolden personally. The record, however, shows that his attorney appeared in the trial court on the alternative writ's return date (March 7, 1966) and moved for a continuance of the action. This was a general appearance, by Wolden, which—apart from the validity of personal service of process— conferred jurisdiction upon the trial court to act with reference to him and to the conduct of his office. (*Zobel* v. *Zobel* (1907) 151 Cal. 98,100-102 [90 P. 191]. See 1 Witkin, Cal. Procedure (1954) Jurisdiction, §§ 71-72 [pp. 341-342], 75 [pp. 344-345].)

### The Content of the Judgment

■ Appellants contend that the judgment is erroneous in both scope and detail. The tenor of their arguments is that the judgment, and the peremptory writ issued pursuant thereto, ordered the affected public officials to act in excess of their legal powers. As to the board of supervisors, some of the actions ordered represented the trial court's concept of the manner in which the board's duty to "supervise the official conduct" of the assessor could appropriately be discharged. Spelling them out in the judgment, the court correctly determined that the board could examine the assessor's "books, records and papers" (see Gov. Code, § 25303 (quoted in fn. 10, *ante*)) and could employ its own expert staff for the purpose of complying with the peremptory writ. (Gov. Code, § 31000;[13] see *Skidmore* v. *County of Amador* (1936) 7 Cal.2d 37, 39-42 [59 P.2d 818].)

---

[13]As pertinent, section 31000 provides that "The board of supervisors may contract with and employ any person for the furnishing to the county, or to a county officer, . . . of special services . . . in financial, economic, accounting, . . . or administrative matters, . . . by any persons especially trained and experienced and who is [*sic*] competent to perform the specific services required. . . ."

██ Contrary to appellants' contention, the board's employment of experts did not involve a violation of Revenue and Taxation Code section 1721 (which prohibits assessment except by the assessor or the valuation of assessable property except by the board of equalization while sitting as such). The judgment and the peremptory writ contemplates that the experts would turn up individual cases requiring both such actions, but each would be performed by the assessor and by the board of equalization, respectively and as the law requires.

██ The trial court also determined in the judgment that the board of supervisors, sitting as such and as the board of equalization, was both dutybound and empowered to require the assessor to "correct his errors" to the extent that he had applied a "non-uniform assessment ratio to properties . . . for the purpose of fixing assessed valuations favoring certain taxpayers." The assessor's duty to apply *uniform* assessment ratios to all property is clear. (Cal. Const., art. XI, § 12; *County of Sacramento* v. *Hickman, supra,* 66 Cal.2d 841 at p. 851.) We deem it equally clear that the board of supervisors is obligated by its duty to "supervise . . . the assessor's . . . official conduct" (Gov. Code, § 25303 (see fn. 10, *ante*)), and enabled by the powers vested in it by the statutes previously cited (Gov. Code, §§ 25303, 31000 (See fn. 13, *ante*); as to the board of equalization, see Rev. & Tax. Code, § 1611) to see that the assessor achieves uniformity among San Francisco property taxpayers. The trial court's determination in this regard was therefore correct.

The judgment nowhere conceives that appellants should or would exceed any of their legal powers in acting pursuant to the writ of mandate. (The writ, in fact, is explicit to the opposite effect: it repeatedly directs the affected officials to act "as authorized by law" or subject to limiting words of similar import.) Whether they exceed their legal powers at any point is a matter to be resolved between them and the affected taxpayers at that time. Until then, various authorities cited by the appellants as limiting their powers to comply with the writ (e.g., *Stafford* v. *Riverside County* (1957) 155 Cal.App.2d 474, 478 [318 P.2d 172]; *Napa Sav. Bank* v. *County of Napa* (1911) 17 Cal.App. 545, 548 [120 P. 449]) are not in point.

### The Judgment For Attorneys' Fees

The main judgment further provided (in response to pertinent allegations in the petition and as prayed therein) that ". . . pursuant to section 27 of the San Francisco Charter, petitioners have and recover from . . . [the] . . . City and County of San Francisco . . . such sum or sums as shall be fixed by this Court as reasonable attorneys' fees . . . at a hearing . . . [thereupon set for a subsequent date] . . .," plus court costs (later fixed in the judgment, pursuant to petitioners' cost bill, in the amount of $27).

On July 12, 1966, having received evidence pertaining to attorneys' fees, the trial court entered a "Judgment and Award of Attorneys' Fees." The July 12 judgment ordered the City and County to make specified payments directly to the law firms named in the petition for writ of mandate. These payments were to be made upon the City and County's receipt of property tax revenues collected after March 28, 1966, in consequence of appellants' compliance with the peremptory writ of mandate. The payments included the fixed amounts of $1,010.81 (referred to in the judgment as the attorneys' "out-of-pocket expenditures") and sums fixed in accordance with a schedule of the property tax revenues collected (20 percent of the first $1 million, 10 percent of the second and 5 percent of the third).

### *The Appeal From the Judgment For Attorneys' Fees (1 Civil 24553)*

Several of appellants' attacks on this judgment rest upon the premises that petitioners were not "beneficially interested" in the action (Code Civ. Proc., § 1086) and that it is not a class action. As we have previously rejected both premises, these arguments fail. (See *Gogerty* v. *Coachella Valley Jr. College Dist., supra,* 57 Cal.2d 727 at p. 730 and cases cited.)

Appellants further challenge the judgment because it makes a "contingent, percentage award" of attorneys' fees, because it orders the payment thereof directly to the law firms involved (rather than to petitioners), and because no "fund was in the court's custody" from which the payment could be made. These provisions, it is argued, violate section 27 of the City and County's charter[14] ("pursuant" to which, according to the main judgment, the award of attorneys' fees was made).

However, this was a class action (see *Gogerty* v. *Coachella Valley Jr. College Dist., supra,* 57 Cal.2d 727 at p. 730 and cases cited) to which equitable principles applied because it was in the nature of mandamus. (*Bruce* v. *Gregory* (1967) 65 Cal.2d 666, 671 [56 Cal.Rptr. 265, 423 P.2d 193].) It follows that the award of attorneys' fees and the details thereof were proper exercises of the trial court's broad equitable powers (*Fletcher* v. *A. J. Industries, Inc.* (1968) 266 Cal.App.2d 313, 319-324 [72 Cal.Rptr. 146], hear den.), of which the existence of an actual fund of money is not a condition precedent. (*Ibid.* at pp. 322-323.) We read nothing in charter section 27 (see fn. 14, *ante*) which conflicts with these equitable powers or their exercise here; the section tends to confirm both and to limit neither.

Appellants have cited numerous decisions in opposition to an attorneys'

[14]Section 27 provides as follows: "In the event that a taxpayer of the city and county institute suit or other proceeding as provided by law against any officer, board or commission of the city and county in the name of said taxpayer on behalf of the city and county, if judgment be finally entered in his favor he shall be allowed his costs and also such reasonable compensation for attorney's fees as may be fixed by the court."

fee award on a "contingent, percentage" basis (e.g., *Estate of McDonald* (1940) 37 Cal.App.2d 521, 525-526 [99 P.2d 1115]), to the payment thereof directly to the attorney recipients (e.g., *City of Los Angeles* v. *Knapp* (1936) 7 Cal.2d 168, 173 [60 P.2d 127], and to the propriety of any award at all in a mandamus action (e.g., *Holbrook* v. *Board of Education* (1952) 113 Cal.App.2d 840 [249 P.2d 29]). None of these involved a class action and, in each, the trial court's power to award attorneys' fees was limited by statute. The character of the present case as a class action, in which the court's broad equitable powers were not limited by statute (including, as we have seen, San Francisco Charter section 27), distinguishes it from any of the authorities cited. (See *Fletcher* v. *A. J. Industries, Inc., supra,* 266 Cal.App.2d 313 at pp. 319-322.)

For the foregoing reasons, we affirm the judgment for attorneys' fees.

### *The Appeal From The Order of April 3, 1967*
### *(1 Civil 25160)*

The order of April 3, 1967, was entered upon petitioners' verified "Application for Instructions" to the trial court, relative to the steps being taken—and to be taken—to comply with the peremptory writ of mandate issued pursuant to the main judgment. Generally, petitioners' application related and referred to the trial court's determination, in the main judgment, that the San Francisco board of supervisors (sitting as such and as the board of equalization) was both dutybound and empowered to require that the assessor "correct his errors" to the extent that he (i.e., Wolden, when in office) had given non-uniform treatment to certain San Francisco taxpayers by applying a "non-uniform ratio to [certain] properties for the purpose of fixing assessed valuations favoring certain taxpayers."

Specifically, petitioners' application recounted the steps taken by the affected public officers to comply with the peremptory writ, and alleged that these had included the application (by Tinney as Wolden's successor in office) of a 50 percent assessment ratio to some personal property as the standard by which he measured the degree to which such property had "escaped" assessment by Wolden during the 1964-1966 tax years and by which standard he (Tinney) had made "deficiency assessments" of such property for the tax periods involved in those years.

The application set forth the prospect that some taxpayers, seeking relief from Tinney's new assessments by the board of equalization sitting in April 1967, would show that the new assessments of their property should have been made by an application of a ratio lower than 50 percent because such lower percentage had been "average" in San Francisco during the tax years in which these taxpayers had been affected by Tinney's compliance with the peremptory writ. According to petitioners' further allegations, the application of a lower-than-50 percent ratio to any such property would subvert

the purpose and the designed effect of the peremptory writ. In the order of April 3, 1967 (entitled "Order and Instructions to Respondents"), the trial court summarily responded to petitioners' application by ordering that the board of equalization was not to "consider nor adopt" any assessment ratio lower than 50 percent in measuring the validity of new assessments involved in any pertinent applications for relief.

Mounting a characteristically massive attack upon the order of April 3, 1967,[15] appellants contend—and we here, again, categorize their numerous points—that (1) the order invokes the erroneous concept that different assessment ratios must be applied as between real and personal property; (2) that it erroneously prohibits the board of equalization from considering the "average" 1964-1966 assessment ratio in dealing with applications for equalization of new assessments made by Tinney for those years; and (3) that it erroneously forecloses relief to taxpayers who are affected by it and who seek relief from it before the board of equalization.

We reject the first argument because, contrary to appellants' interpretation, the April 3 order does not require the application of different assessment ratios as between real and personal property. (Appellants' arguments go to the order's "theory"; we refer to its explicit terms, which neither differentiate between classes of property nor require different ratios to be applied as between real and personal property.) For the reasons which follow, we do not reach the second and third arguments.

The main judgment and the peremptory writ of mandate issued pursuant thereto (the latter of which we have upheld by affirming the former) established only that the affected public officers must examine past (i.e., Wolden's) assessments and adjust them to the extent necessary and legally possible. The order of April 3, 1967, sets a standard for compliance with the peremptory writ in significant respects. If the standard was wrong in the case of any affected taxpayer (e.g., because such person could show a competent court that he had received discriminatory treatment as a consequence of official compliance with the writ), only that taxpayer can complain: the City and County of San Francisco cannot, the board of supervisors and the board of equalization cannot, the assessor cannot. The question posed by appellants' arguments on this point relate only to the interests (if any) of affected taxpayers. We conclude that the interests of appellants—whatever they might be, even considered severally—are not "injuriously affected" by the April 3 order; for this reason, we dismiss their

---

[15]As respondents on the appeal therefrom, petitioners have not questioned whether the order is appealable. For purposes of this dispositon, we treat it as appealable as a "special order made after final judgment" (Code Civ. Proc., 963, subd. 2, which "bear[s] some relation to . . . [the main judgment] . . . by way of enforcing it . . ." (*Lake* v. *Harris* (1926) 198 Cal 85, 89 [243 P. 417]. See 3 Witkin, Cal. Procedure, *supra*, Appeal, § 23, pars. [1], [2], pp. 2167- 2168.)

appeal from it. (See *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co.* (1964) 231 Cal.App.2d 80, 81-82 [41 Cal.Rptr. 597].)

### Miscellaneous Appeals

The city attorney saw fit to file four separate notices of appeal at various intervals, thereby imposing upon this court the onerous burden of sifting through the 1,200-page clerk's transcript in order to dispose of at least a dozen appeals from orders not previously mentioned herein. One of them is an appeal from an order entered pursuant to Code of Civil Procedure section 1110b, denying a stay of execution upon the main judgment. Having affirmed the latter on the appeal therefrom, we dismiss this one as moot. (*Fuller* v. *San Bernardino Valley Municipal Water Dist.* (1966) 242 Cal.App.2d 66, 67-68 [51 Cal.Rptr. 130].) Others purport to be from orders denying appellants' various motions to vacate the main judgment and the judgment awarding attorneys' fees. Assuming (but not holding) that these were appealable orders (see 3 Witkin, Cal. Procedure, *supra*, Appeal, § 26, 2170-2171), we similarly dismiss them—as moot—because we have affirmed both judgments. (*Fuller* v. *San Bernardino Valley Municipal Water Dist., supra.*)

Among the other appeals purportedly pending, we dismiss some because they were taken from patently nonappealable orders. (Code Civ. Proc., § 963; *City of Los Angeles* v. *Schweitzer* (1962) 200 Cal.App.2d 448, 452 [19 Cal.Rptr. 429]. As to one such order, e.g., which substituted Tinney for Wolden as a party to the action, see *Camp* v. *Oakland Mortg. etc. Co.* (1928) 205 Cal. 380, 381-382 [270 P. 685].) Other appeals are merely repetitive; the city attorney purportedly appealed at least twice from several orders. Because he should have known better, we deem these appeals frivolous and dismiss them for that reason. (*Estate of Wunderle* (1947) 30 Cal.2d 274, 279 [181 P.2d 874]; see *Estate of D'Avila* (1963) 217 Cal.App.2d 123, 124 [31 Cal.Rptr. 363].)

In 1 Civil 24553, the judgments entered on March 28, 1966 (directing issuance of a peremptory writ of mandate) and on July 12, 1966 (fixing and awarding attorneys' fees) are affirmed. In 1 Civil 25160, the appeal is dismissed. All other appeals pending under either number are dismissed. Respondents shall recover costs on appeal.

Christian, J., and Elkington, J.,* concurred.

A petition for a rehearing was denied November 26, 1969, and appellants' petition for a hearing by the Supreme Court was denied December 17, 1969.

---

*Assigned by the Chairman of the Judicial Council.