[No. B193338. Second Dist., Div. Four. Aug. 28, 2007.]

AMERICAN EMPLOYERS GROUP, INC., Plaintiff and Appellant, v. EMPLOYMENT DEVELOPMENT DEPARTMENT, Defendant and Respondent.

838

COUNSEL

Fisher & Phillips, John M. Polson, Mark J. Jacobs, Raphael G. Nendel-Flores, Sheldon J. Blumling; and Jeffrey A. Silver for Plaintiff and Appellant.

Edmund G. Brown Jr., Attorney General, Felix E. Leatherwood, Joseph M. O'Heron and Anthony F. Sgherzi, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

EPSTEIN, P. J.—American Employers Group, Inc., appeals from the dismissal of its action following the denial of its petition for writ of mandate and the sustaining of a demurrer without leave to amend. We find no error and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Unemployment Insurance Code sections 135.1 and 135.2[1] codify the tax concept of unity of enterprise. Under these provisions, the Employment Development Department (EDD) is authorized to consolidate multiple businesses united by factors of ownership or control into a single employing unit for purposes of determining the rate of employer contributions. These statutes are aimed at preventing a tax evasion practice known as "SUTA dumping."[2] As explained in an information sheet published by the EDD, SUTA dumping "includes acts to manipulate state account numbers and the [unemployment insurance] experience rating process. When a low [unemployment insurance] rate is obtained, payroll from another entity with a high [unemployment insurance] tax rate is shifted to the account with the lower rate. The entity with the higher rate is then 'dumped.' The entity inactivates the higher rated account and the charges are apportioned to the rest of the employers in the state. Such abusive schemes leave other employers making up for the unpaid tax. SUTA dumping is also referred to as state unemployment tax avoidance and unemployment tax rate manipulation."

This action arises from the EDD's unity of enterprise determination against appellant American Employers Group, Inc. (AEG). AEG is a Nebraska corporation which contracts with businesses to provide payroll processing, workers' compensation, and other related services with respect to individuals performing services for these businesses. It issues payroll checks using AEG's checks, issues W-2 forms reflecting AEG as the employer, and reports federal payroll taxes using AEG's federal tax identification number. AEG reports individuals who perform services in California under AEG's EDD identification number, and pays unemployment insurance contributions at the rate determined by the EDD for AEG.

---

[1] All statutory references are to the Unemployment Insurance Code unless otherwise indicated.

[2] SUTA is short for State Unemployment Tax Act.

In June 2003, the EDD began an audit of AEG with respect to five California businesses whose workers were paid through AEG. In September 2003, the EDD issued a proposed notice of assessment for additional unemployment insurance contributions in the total amount of $20,402,243.12, including penalties and interest. The notice stated: "This assessment is estimated from the best information available to the Department. Reports were filed under an incorrect account number." The notice also explained: "If you do not concur with these amounts, you may contact the auditor at the phone number shown above to request a conference with the audit supervisor. It may be to your advantage to meet with the audit supervisor to correct any inaccuracies in this Proposed Notice of Assessment before an Official Notice of Assessment is issued. Upon receiving an Official Notice of Assessment, if you do not concur, you will have petition rights at that time. Instructions for filing an appeal will be included with that notice."

Representatives of the EDD and AEG met to discuss the proposed assessment in October and November 2003. According to AEG, after extensive settlement discussions, the parties agreed to a proposed settlement of the assessment at $4.4 million, and to additional terms and conditions. However, in a letter to the EDD dated November 19, 2003, AEG outlined "the basic terms of settlement *tentatively* agreed to" between the EDD and AEG. (Italics added.) AEG sent a supplemental letter on December 9, 2003, noting that it had agreed to settle the pending issues with the EDD, but that "a number of logistical problems remain in order to fully implement our agreement." AEG proposed solutions to each of the problems, and asked the EDD to "review these matters at your earliest opportunity and let me know your thoughts."

By letter dated April 29, 2004, the EDD notified AEG that its settlement proposal had been rejected. "As a result, a notice of assessment will be issued to AEG for the period January 1, 2001—March 30, 2004. Thus, AEG may pursue its administrative remedies including filing a petition for reassessment." The following day, AEG delivered a check in the amount of $4.4 million to the EDD. By letter dated May 3, 2004, the EDD returned the check to AEG, rejecting AEG's assertion that a negotiated settlement had been reached between AEG and the EDD.

On May 5, 2004, the EDD issued a notice of assessment against AEG in the total amount of $27,368,593. The notice of assessment was issued under AEG's account number, and listed as related entities California Employer Group No. 27, AEG Processing Center No. 35, AUI Employer Group No. 42, and Applied Processing Center No. 60. The notice stated: "This assessment is

for underpayment of your unemployment insurance due to State unemployment tax rate manipulation (SUTA Dumping)." The assessment was accompanied by a notice of petition rights, setting out the procedure for AEG to file a petition for reassessment by an administrative law judge of the California Unemployment Insurance Appeals Board.

AEG filed a timely petition for reassessment. AEG also brought an action in the Nebraska state court to restrain the EDD from assessing additional tax liability. The Nebraska court dismissed the action, and AEG then filed this action in the Los Angeles Superior Court. AEG alleged that the EDD had breached a settlement agreement. It also asserted causes of action for promissory estoppel and violation of federal and state due process. AEG alleged that the EDD failed to discharge a mandatory duty to conduct a hearing prior to the issuance of any assessment, and that it improperly assessed taxes after the expiration of the calendar year rating period in which the alleged error occurred, in violation of section 1036 and California Code of Regulations, title 22, section 1036-2. The seventh cause of action sought a writ of mandate to compel the EDD to comply with its statutory obligations.

The trial court bifurcated the seventh cause of action for writ of mandate from the other causes of action, referred it to the writs and receivers department for hearing, and stayed proceedings on the remainder of the complaint. AEG filed a first amended petition for writ of mandate. The court (Hon. Dzintra I. Janavs) denied the petition. The EDD's demurrer to the remainder of the complaint was then heard. The court (Hon. Alice E. Altoon) sustained the demurrer to the remaining causes of action without leave to amend. The court entered an order of dismissal, and AEG appeals.

## DISCUSSION

### I

In its first amended petition for writ of mandate, AEG sought to compel the EDD to provide a hearing *prior* to issuing an assessment for additional unemployment insurance contributions based on a unity of enterprise determination. This relief was sought based on AEG's interpretation of sections 135.1 and 135.2, the statutes governing unity of enterprise determinations. As we explain, this is the same theory for relief AEG asserted in its petition for reassessment with the California Unemployment Insurance Appeals Board.

■ Section 135.1 describes what is known as a vertical unity of enterprise, where there is an acquisition or change in the form or organization of an existing business, but there is a continuity of control of the business enterprise. It provides: "(a) A new employing unit shall not be created when there is an acquisition or change in the form or organization of an existing business enterprise, or severable portion thereof, and there is a continuity of control of the business enterprise." Section 135.2 describes what is classified as a horizontal unity of enterprise. Under that section, "[i]f two or more business enterprises are united by factors of control, operation, and use, the director may determine that the business enterprises are one employing unit." (§ 135.2, subd. (a).) Both unity of enterprise statutes provide that they are "subject to . . . subdivision (d) of Section 1127.5." (§§ 135.1, subd. (f), 135.2, subd. (b).)

■ Section 1127.5 addresses a determination by the EDD that an individual or entity is not the correct employer of the employee for whom it is reporting wages. Where such a determination is made, the director is required to give notice of the determination to the correct employer and to the employer who has been reporting the wages. "The notice shall contain a statement of the facts and circumstances upon which the determination was based. An individual or entity so noticed shall have the right to petition for review of the determination within 30 days of the notice, as provided in Section 1222." (§ 1127.5, subd. (b)(2).) ■ Under section 1127.5, subdivision (c)(1), if the employer that is determined not to be the correct employer appeals that determination, that employer shall continue to report employee wages until a decision on its appeal is final. Under section 1127.5, subdivision (c)(2), if the employer that is determined to be the correct employer appeals that determination, but the employer determined not to be the correct employer does not appeal, the correct employer is to report the wages until a decision on its appeal is final.

Subdivision (d) of section 1127.5, which is expressly applicable to unity of enterprise determinations under sections 135.1 and 135.2, provides: "When a director's determination that an individual or entity is the correct employer of employees whose wages have been reported by another individual becomes final: [¶] (1) The individual or entity so determined to be the correct employer may be assessed for any underpayment of employer contributions pursuant to Article 8 (commencing with Section 1126) of Chapter 4 of Part 1 of Division 1. . . . [¶] (2) The individual or entity which had reported employee wages prior to the finality of the director's determination of the

correct employer of the employees whose wages were so reported may file a claim for refund for any overpayment of employer contributions pursuant to Section 1178. . . ."

In its petition for reassessment, AEG asserted that all the procedures set out in section 1127.5 apply to unity of enterprise determinations by the EDD pursuant to sections 135.1 and 135.2. AEG claimed that under subdivisions (b) and (c) of section 1127.5, it was entitled to an administrative hearing to review the EDD's correct employer determination prior to being assessed for underpayment of employer contributions, and to continue making payments under the status quo. The petition for reassessment requested "that the assessment be set aside pending a hearing on the EDD's decision to treat the Taxpayer and the other entities named in the assessment (collectively, the 'Assessed Entities') as a single reporting employer subject to retroactive and prospective unemployment insurance ('UI') rate recalculations. The Taxpayer further requests that a hearing be granted in connection with these issues and the matters discussed herein."

In its petition for reassessment, AEG also sought to have the assessment vacated on the ground that the EDD had no authority to apply the unity of enterprise provisions on a retroactive basis, and that such retroactive assessment constituted a violation of due process. In its petition for writ of mandate, AEG again argued against retroactive assessment.

■ The trial court held, and we agree, that the administrative proceeding initiated by the petition for reassessment must be completed before AEG is entitled to judicial review. "[W]here an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942].) This doctrine is applicable to tax matters. (*City of Los Angeles v. Centex Telemanagement, Inc.* (1994) 29 Cal.App.4th 1384, 1388 [34 Cal.Rptr.2d 782].) "The requirement of exhaustion of administrative remedies is founded on the theory that the administrative tribunal is created by law to adjudicate the issue sought to be presented to the court, and the issue is within its special jurisdiction. If a court allows a suit to go forward prior to a final administrative determination, it will be interfering with the subject matter of another tribunal." (*Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1552 [6 Cal.Rptr.2d 698].)

 AEG argues it should be exempted from the administrative exhaustion requirement, as were the plaintiffs in *Venice Town Council, Inc. v. City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1567 [55 Cal.Rptr.2d 465] and *Knoff v. City etc. of San Francisco* (1969) 1 Cal.App.3d 184, 199 [81 Cal.Rptr. 683]. In the *Venice Town Council* case, the plaintiffs did not challenge any particular land use decisions by the City of Los Angeles, but instead sought review of the city's "overarching policies in implementing" a statutory scheme addressing affordable housing, and sought to correct the city's interpretation of its responsibilities under that statute. (*Venice Town Council Inc., supra*, 47 Cal.App.4th at p. 1567.) In the *Knoff* case, petitioners sought "to bring about examination and correction of wholesale deficiencies in the San Francisco assessment situation which reasonably require, not the adjustment of some specific assessments or the recovery of taxes paid upon them, but the examination of all assessments and the adjustment of those which require such action and can legally be reached." (*Knoff, supra*, 1 Cal.App.3d at p. 199.) In contrast, AEG is seeking adjustment of specific unity of enterprise determinations and related assessments. The fact that other employers might have the same complaint does not change the specific relief sought by AEG. It is required to first exhaust its administrative remedies before it is entitled to judicial review. The trial court properly denied the petition for writ of mandate on this basis.[3]

## II

We turn to the order sustaining the EDD's demurrer to the first six causes of action in AEG's complaint. In reviewing an order sustaining a demurrer, we accept as true all material facts properly pleaded. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) We also consider matters that may be judicially noticed, and give the complaint a reasonable interpretation, reading it as a whole and considering its parts in context. (*Ibid.*) We must determine whether the complaint states facts sufficient to constitute a cause of action, and if not, we must decide whether there is a reasonable possibility that the defect can be cured by amendment. (*Ibid.*)

---

[3] The court also denied relief under article XIII, section 32 of the California Constitution, sometimes referred to as the " 'pay first, litigate later' " rule (*First Aid Services of San Diego, Inc. v. California Employment Development Dept.* (2005) 133 Cal.App.4th 1470, 1478 [35 Cal.Rptr.3d 663]), and section 1851, which prohibits issuance of an injunction, writ of mandate, or other legal or equitable process against the state to prevent or enjoin the collection of taxes. In light of our affirmance based on exhaustion of administrative remedies, we need not address these grounds.

The first cause of action was for breach of contract. AEG alleged that after receiving notice of the proposed assessment, its representatives met with representatives of the EDD in October 2003; they agreed to meet again to discuss a possible settlement; prior to the second meeting, the parties assured each other that their representatives had sufficient authority to enter into a binding settlement agreement; in particular, Don Kirkpatrick, district tax administrator for the EDD, confirmed that he had authority to negotiate and make a binding settlement offer and AEG relied on that confirmation.

The parties met again on November 5, 2003, in the EDD's office in Van Nuys. According to the complaint, "Extensive settlement discussions ensued and a proposal to settle the monetary aspect of the proposed assessment was made of $4.4 million, with additional provisions including a joint press statement concerning the settlement, future reporting requirements of AEG to report unemployment contributions using its clients' EDD identification numbers and an unemployment insurance rate for AEG's clients of 3.4% for the fourth quarter of 2003 and calendar year 2004, after which the rates would be subject to annual revisions based upon experience." AEG alleged that the two EDD representatives, Barbara Kaufman and Don Kirkpatrick, excused themselves to discuss the proposal and obtain any necessary approvals. Upon their return, Kirkpatrick told AEG's representative that the proposed settlement agreement was accepted by the EDD, and they shook hands to confirm the agreement. This agreement was allegedly confirmed in a telephone call shortly after the November 5 meeting.

"Based upon the foregoing, AEG's counsel on November 19, 2003 confirmed the terms and conditions of the Settlement Agreement in written correspondence, a copy of which is attached hereto as Exhibit B." It is exhibit B that undermines AEG's claim that the parties had entered into a settlement agreement. The letter, addressed to Don Kirkpatrick of the EDD, begins: "Pursuant to your telephone message earlier today, this correspondence shall outline the basic terms of settlement tentatively agreed to" between the EDD and AEG. The letter outlines the basic terms, and concludes: "Please review the terms and conditions detailed above. Should this comport with your understanding, we would be willing to prepare a more formal Agreement to be executed by both parties. Obviously, until such formal Agreement is executed, these terms are tentative in nature." Considered together, the preceding allegations and this incorporated letter establish nothing more than a tentative agreement between EDD and AEG. Significantly, AEG's letter expressly recognizes the tentative nature of the proposed agreement until such time as a formal agreement is executed.

AEG alleged that after November 19, 2003, "AEG continued to correspond with Don Kirkpatrick confirming that AEG was operating and relying on the

Settlement Agreement. Attached hereto as Exhibit C is a copy of such correspondence." Exhibit C is a letter from AEG's counsel to Mr. Kirkpatrick on December 9, 2003. It states in part: "This letter will supplement John Polson's letter to you of November 19, 2003, and our telephone conversation of Friday, December 5, 2003. [¶] While we have agreed to settle the pending issues between American Employers Group, Inc. ('AEG'), AEG Processing Center No. 35 ('AEG 35') and the Employment Development Department ('EDD') a number of logistical problems remain in order to fully implement our agreement." The letter then discusses the logistical problems and AEG's "proposed resolutions" to them. The letter concludes: "Each of the items discussed herein is consistent with our settlement agreement and simply reduces the administrative burdens necessitated by our settlement agreement. Please review these matters at your earliest opportunity and let me know your thoughts. Of course, if another meeting is necessary, I would be pleased to attend."

AEG next alleged that on April 30, 2004, it submitted its first quarter report and contributions in accordance with the terms of the settlement agreement, and on that same date, it tendered a check for $4.4 million to the EDD in accordance with the agreement. It then alleged: "On April 29, 2004 and May 3, 2004, the EDD in breach of the Settlement Agreement returned the $4.4 million check and stated its intention to issue an assessment covering the periods addressed in the Settlement Agreement."

The correspondence from the EDD was attached to the complaint. Exhibit E, the April 29, 2004 letter, provides: "The settlement proposal submitted by American Employers Group ('AEG') has been rejected by the Employment Development Department. As a result, a notice of assessment will be issued to AEG for the period January 1, 2001—March 30, 2004. Thus, AEG may pursue its administrative remedies including filing a petition for reassessment." Exhibit F, the May 3, 2004 letter, provides: "The Employment Development Department (the 'Department') is returning the check in the amount of $4.4 million delivered to the Department's Van Nuys Area Audit Office late on Friday, April 30, 2004. Contrary to the assertion in your letter, there was no negotiated settlement between American Employers Group ('AEG') and the Department. Furthermore, you were informed on Thursday, April 29, 2004 by Barbara S. Kaufman of the Legal Office, that AEG's settlement proposal had been rejected by the Department."

"[T]here is no contract until there has been a meeting of the minds on *all* material points." (*Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 358 [72 Cal.Rptr.2d 598].) "Mutual intent is determinative of contract formation because there is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense. . . . Thus,

the failure to reach a meeting of the minds on all material points prevents the formation of a contract *even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*" (*Id.* at pp. 358–359, citation omitted.)

"Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 [127 Cal.Rptr.2d 145].) Accepting the allegations of the complaint and the contents of the incorporated exhibits as true, we conclude that the parties had only a tentative settlement agreement; that they understood they had only a tentative agreement until such time as they executed a formal agreement; that AEG proposed changes to the tentative agreement; and that the EDD ultimately rejected AEG's proposal. There is no manifestation of mutual assent. AEG has not alleged sufficient facts to establish the formation of a contract, and thus has not stated a cause of action for breach of contract.[4]

AEG's second cause of action is for promissory estoppel. AEG alleged that it established its unemployment insurance pricing with its clients based on the rate it had negotiated with the EDD in the settlement agreement. Our conclusion that AEG has not alleged facts establishing the existence of a settlement agreement also precludes AEG from stating a cause of action for promissory estoppel based on the alleged agreement.

The third, fourth and fifth causes of action alleged that the EDD violated AEG's right to state and federal due process, based on its failure to provide a preassessment hearing, and its issuance of an assessment after the expiration of the rating period to which the assessment relates. The sixth cause of action sought declaratory relief on these same issues. As explained in part I, *ante*, these are the same claims presently pending before the California Unemployment Insurance Appeals Board. AEG must complete this administrative review before seeking judicial relief on these issues.

AEG has not shown there is a reasonable probability that it can amend its complaint to cure the defects in its complaint. (See *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) Thus, we find no abuse of discretion in the sustaining of the demurrer without leave to amend.

---

[4] In light of this conclusion, we need not address EDD's argument that there could not have been a valid settlement agreement because section 1236 requires approval of the Attorney General for settlement of an employment tax dispute involving a reduction in tax in excess of $7,500, and no such approval was sought or given.

## DISPOSITION

The order is affirmed.

Willhite, J., and Manella, J., concurred.

A petition for a rehearing was denied September 17, 2007, and appellant's petition for review by the Supreme Court was denied December 12, 2007, S157162.