[S.F. No. 23263. In Bank. Feb. 3. 1976.]

BRET HARTE INN, INC., Plaintiff and Respondent, v.
CITY AND COUNTY OF SAN FRANCISCO,
Defendant and Appellant.

**COUNSEL**

Thomas M. O'Connor, City Attorney, and George E. Baglin, Deputy City Attorney, for Defendant and Appellant.

Lowenthal & Lowenthal, Morris Lowenthal and Juliet Lowenthal as Amici Curiae on behalf of Defendant and Appellant.

Athearn, Chandler & Hoffman, Theodore P. Lambros and Richard Harrington for Plaintiff and Respondent.

## OPINION

**SULLIVAN, J.**—Defendant City and County of San Francisco appeals from a judgment granting recovery of certain personal property taxes paid under protest. The major question before us is whether an assessor, in determining full cash value pursuant to relevant constitutional and statutory provisions, may do so by simply discounting acquisition cost by a uniform 50 percent "depreciation factor." We conclude that he may not; we affirm the judgment.

The facts, as substantially disclosed by the fully supported findings of the trial court, are as follows: Plaintiff, a California corporation, owned and operated the Hotel Stewart in San Francisco. In 1964, 1965 and 1966, within the time provided by law, it filed personal property tax returns and declarations relative to merchandise, equipment, and cash located in the hotel. The 1964 and 1965 returns did not disclose costs of merchandise and equipment, but defendant's auditors subsequently determined these costs by audit. The 1966 returns disclosed such costs according to plaintiff's books. Assessments were made for the three years in question in accordance with the aforesaid figures and plaintiff made timely payment of taxes based upon such assessments.

In 1966, following an extensive investigation by the grand jury relative to criminal misconduct in office by the former assessor, and in the context of a taxpayers' suit which sought to require official action addressed to the situation brought about by such misconduct, the superior court issued a writ of mandate directing defendant to undertake appropriate steps to recover taxes lost due to the misconduct of the former assessor. (*Knoff* v. *City etc. of San Francisco*, No. 564237, Superior Court of the State of California for the City and County of San Francisco, affd. (1969) 1 Cal.App.3d 184 [81 Cal.Rptr. 683].) Pursuant thereto, the assessments of plaintiff's personal property for 1964, 1965, and 1966 were audited by certified public accountants, and based upon the determinations so made, defendant in March of 1967 levied escape assessments of $1,975.03, $2,569.45, and $931.49 for the respective years in question. Timely applications to cancel these escape assessments were denied by the board of supervisors sitting as a board of equalization, and the assessments were paid under protest. This action for refund followed.

The evidence at trial showed that the assessor, in appraising business equipment, determined full cash value by taking the owner's original acquisition costs and deducting 50 percent for depreciation, regardless of

the property's age or condition. After establishing the property's full cash value in this manner, the assessor applied the then prevailing assessment ratio to determine the assessed valuation. Property taxes were computed on the basis of the property tax rate per $100 of assessed valuation. The assessment ratio applied during the years 1964-1966 and in the course of the "re-auditing" and "re-appraisal" procedures undertaken pursuant to the mandate issued in the *Knoff* case (see *Knoff* v. *City etc. of San Francisco, supra,* 1 Cal.App.3d 184, 194) was 50 percent.

The uncontradicted testimony of two of plaintiff's witnesses, a vice-president of plaintiff and an auctioneer, indicated that the full cash value of the subject personal property during the relevant years—arrived at by actual on-site appraisal—was not only less than that indicated in the escape assessments but less than that reflected in the original assessments.

The trial court, concluding that the method of valuation was invalid, rendered judgment for the taxpayer in the amount of the taxes paid under protest pursuant to the escape assessments ($5,475.97) plus interest. This appeal followed.

I

THE AVAILABILITY OF REVIEW

We reject at the outset the contention of amicus curiae that plaintiff is foreclosed by principles of res judicata from raising any objection to the method of valuation in this proceeding. The argument, as we understand it, is that because the *Knoff* mandate, as upheld in *Knoff* v. *City etc. of San Francisco, supra,* 1 Cal.App.3d 184, concerned itself not with valuation practices but with a uniform application of the appropriate assessment *ratio,* all persons subject to that mandate, in contesting any tax subsequently levied pursuant to it, were limited to challenges relating to ratio. This argument fails on two grounds. In the first place, plaintiff was not a party to the *Knoff* proceeding, and the interests of all parties to that proceeding were adverse to those of plaintiff, a taxpayer resisting the imposition of further taxes. In these circumstances plaintiff could in no way be bound by the determinations made in that case. (See *Hansberry* v. *Lee* (1940) 311 U.S. 32, 45 [85 L.Ed. 22, 28-29, 61 S.Ct. 115, 132 A.L.R. 741].) Secondly, we do not read the *Knoff* mandate as narrowly as amicus curiae would have us. The Court

of Appeal, in accurately characterizing and summarizing the writ,[1] made it quite clear that the mandate contemplated a complete reexamination of the issue of taxes legally owed by the taxpayers in question. Moreover, it indicated that matters of abuse of powers under the writ were "to be resolved between them and the affected taxpayers at that time [i.e., in the course of normal proceedings for the challenge of escape assessments made]." (*Knoff, supra,* at p. 202.) Plaintiff has undertaken such proceedings, and the question it seeks to raise is now properly before us.

## II

### THE PROPER STANDARD OF REVIEW

At the time of the escape assessments here in question the California Constitution required, in article XI, section 12, that "[a]ll property subject to taxation . . . be assessed for taxation at its full cash value."[2] Section 401 of the Revenue and Taxation Code set forth the same

---

[1] The Court of Appeal stated: "The writ further ordered the board of supervisors to conduct the project, in cooperation with the assessor and his office but 'through' independent experts ('auditors, *appraisers* and certified public accountants'). The experts were to be employed by the board for the purpose of identifying taxable properties which had not been assessed, or which had been underassessed or had 'otherwise escaped taxation for any reason,' due to the assessor having applied an improperly low assessment ratio, *inaccurate reporting of cost or value by a taxpayer, misuse of cost or value figures (accurately reported or not) by the assessor;* and the fixing of improperly low assessed valuations by the assessor pursuant to 'arrangement' with him or with anyone employed in his office. The experts were to make a full 'audit or re-audit' and *'appraisal or re-appraisal'* of property which, there was reasonable cause to believe, had escaped taxation by reason of any of the just-mentioned acts or omissions. [¶] The assessor and the board of equalization were ordered to take appropriate action to identify the property in question, *to make new assessments as authorized by law* (including penal assessments); to make appropriate changes in the assessment roll (the board of equalization was specifically ordered to direct the assessor to do this); and to recover any property taxes owing the City and County, with appropriate penalties authorized by law. The assessor was ordered to cooperate with the board of supervisors in the investigation and to give its experts full access to all information in his possession." (*Knoff, supra,* at pp. 194-195; italics added.)

[2] In 1970 section 12 of article XI was renumbered as section 37 of article XIII. In 1974 that section was repealed, and the quoted portion appeared in a new form in section 1 of article XIII: "Unless otherwise provided by this Constitution or the laws of the United States: (a) All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value. (b) All property so assessed shall be taxed in proportion to its full value." (See *County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841 [59 Cal.Rptr. 609, 428 P.2d 593].)

requirement;[3] section 110 of the same code defined full cash value as " 'the amount at which property would be taken in payment of a just debt from a solvent debtor.' " In *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 561-562 [290 P.2d 544], this court interpreted section 110 as providing for assessment "at the price that property would bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other."[4]

In passing upon various methods of valuation, the courts have shown an understandable reluctance to declare a particular method of valuation invalid under these provisions and thereby jeopardize a major portion of a county's assessment roll. (*Rittersbacher* v. *Board of Supervisors* (1934) 220 Cal. 535, 542 [32 P.2d 135].) Consequently, they have presumed the regularity and correctness of the assessor's determinations (*Utah Construction Co.* v. *Richardson* (1921) 187 Cal. 649, 654 [203 P. 401]; *Hunt-Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163, 179-180 [116 Cal.Rptr. 160]; *Red Bluff Developers* v. *County of Tehama* (1968) 258 Cal.App.2d 668, 673 [66 Cal.Rptr. 229]; see generally *Charleston Assn.* v. *Alderson* (1945) 324 U.S. 182, 191 [89 L.Ed. 857, 864-865, 65 S.Ct. 624]), and, since until recently the law has specified no particular method for determining full cash value,[5] have recognized a wide discretion invested in the assessor to devise an appropriate scheme. (*De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 564; *Utah Constr. Co.* v. *Richardson, supra,* 187 Cal. 649, 652-653.)

The standard of review applied in the early cases challenging the valuation methods of the assessing authority was quite limited. Thus, in *Los Angeles etc. Co.* v. *County of L. A.* (1912) 162 Cal. 164 [121 P. 384, 9 A.L.R. 1277], the trial court had found that the extreme disparity between the valuation of plaintiff's property and that of his competitors' resulted from "a design on the part of the assessor to discriminate against

---

[3]Section 401, as amended in 1972 and 1974, now requires that all taxable property be assessed at 25 percent of "full value." Article XIII, section 1, of the Constitution and section 110.5 of the Revenue and Taxation Code define "full value" as the property's fair market value or whatever other value standard the Constitution prescribes or authorizes. (See generally Ehrman & Flavin, Taxing California Property (1967) § 29 (hereinafter cited as Ehrman & Flavin).)

[4]Section 110 was later amended to conform to the *De Luz* definition of full cash value.

[5]In 1967 the State Board of Equalization, pursuant to powers vested in it by section 15606 of the Government Code, issued a comprehensive set of rules governing the valuation principles and procedures to be followed by local boards and assessors. These rules, however, are not applicable to the tax years here in question.

plaintiff, and the adoption and use by said assessor of an intentionally radical [*sic*] different method in arriving at the value of plaintiff's property from that used in all other cases . . . ." Nevertheless, the court, determining whether the assessment amounted to fraud or "something equivalent to fraud in the making of the assessment, producing such effect," held that the Board of Equalization's approval of the assessment cured any wrongdoing on the assessor's part even though the trial court had also found the board's approval "merely perfunctory in character and hardly more than a mere form . . . ."

In *Southern Pac. Land Co.* v. *San Diego Co.* (1920) 183 Cal. 543 [191 P. 931], the court, citing *Los Angeles G. & Elec. Co., supra,* held that when a complaint alleged that the Board of Equalization approved an assessment in excess of the actual value of the plaintiff's land with knowledge that the assessor had assessed the rest of the county at less than 25 percent of true value, the complaint stated a cause of action and showed "something equivalent to fraud." In *Mahoney* v. *City of San Diego* (1926) 198 Cal. 388 [245 P. 189], the trial court had found that the assessor assessed all land in the city at 80 to 100 percent of full cash value but assessed all improvements and personal property at 25 percent or less. The court affirmed a judgment for the plaintiff on the ground that the assessment pattern implied fraud or "something equivalent to fraud." In *Rittersbacher* v. *Board of Supervisors, supra,* 220 Cal. 535, the court refused to invalidate an elaborate assessment formula, citing *Mahoney, supra,* for the proposition that, in judging the assessor's methods, the courts will consider only whether they constituted "an arbitrary and wilful disregard of the law intended for his guidance" and were "a constructive fraud upon [the plaintiffs]." (220 Cal. at p. 542.)

More recently, however, the decisions have exhibited a trend towards less drastic requirements where aggrieved taxpayers have sought to set aside assessments. In *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 564, the court reinterpreted the "something-equivalent-to-fraud" standard as allowing judicial review for "arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature," and this standard now appears to have replaced the less specific constructive fraud standard of the *Mahoney* era. (See *Hunt-Wesson Foods, Inc.* v. *County of Alameda, supra,* 41 Cal.App.3d 163, 180; *Westlake Farms, Inc.* v. *County of Kings* (1974) 39 Cal.App.3d 179, 186-187 [114 Cal.Rptr. 137]; *Georgia-Pacific Corp.* v. *County of Butte* (1974) 37 Cal.App.3d 461, 473 [112 Cal.Rptr. 327]; *Red Bluff Developers* v. *County of Tehama, supra,* 258 Cal.App.2d 668, 674; *County of Amador*

v. *State Board of Equalization* (1966) 240 Cal.App.2d 205, 216 [49 Cal.Rptr. 448]; *County of Tuolumne* v. *State Board of Equalization* (1962) 206 Cal.App.2d 352, 372 [24 Cal.Rptr. 113].)

■ The recent cases have also distinguished between challenges to the result reached by the assessor after applying a sound valuation method and challenges to the validity of the method itself. (See generally *Georgia-Pacific Corp.* v. *County of Butte, supra,* 37 Cal.App.3d 461, 473-474.) If the plaintiff claims only that the assessor and the Board of Equalization erroneously applied a valid method of determining full cash value, the decision of the board is equivalent to the determination of a trial court, and the trial court in turn may review only the record presented to the board. (*Pacific Grove-Asilomar Operating Corp.* v. *County of Monterey* (1974) 43 Cal.App.3d 675, 681 [117 Cal.Rptr. 874]; *Glidden Company* v. *County of Alameda* (1970) 5 Cal.App.3d 371, 378-379 [85 Cal.Rptr. 88, 86 Cal.Rptr. 464].) The trial court may overturn the board's decision only when no substantial evidence supports it, in which case the actions of the board are deemed so arbitrary as to constitute a deprivation of property without due process. (*Hunt-Wesson Foods, Inc.* v. *County of Alameda, supra,* 41 Cal.App.3d 163, 177; see generally *Charleston Assn.* v. *Alderson, supra,* 324 U.S. 182, 191.) On the other hand, when the taxpayer challenges the validity of the valuation method itself, the trial judge is faced with a question of law. (*Mahoney* v. *City of San Diego, supra,* 198 Cal. 388, 403-404; *Hunt-Wesson Foods, Inc.* v. *County of Alameda, supra,* 41 Cal.App.3d 163, 178; *Georgia-Pacific Corp.* v. *County of Butte, supra,* 37 Cal.App.3d 461, 473-474; cf. *Board of Supervisors* v. *Archer* (1971) 18 Cal.App.3d 717, 723-724 [96 Cal.Rptr. 379].) That question, stated in terms of the more modern authorities discussed above, is whether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law. It is this test which we apply today.

III

THE VALIDITY OF THE METHOD HERE UTILIZED

■ In reviewing this defendant's valuation method we begin with the proposition that no property may escape taxation because of the difficulty of determining its full cash value. "[T]he absence of an 'actual market' for a particular type of property does not mean that it has no value or that it may escape from the constitutional mandate that 'all property . . . shall be taxed in proportion to its value' . . . but only that

the assessor must then use such pertinent factors as replacement costs and income analyses for determining 'valuation.' " (*Kaiser Co.* v. *Reid* (1947) 30 Cal.2d 610, 623 [184 P.2d 879].)

The assessors have developed three basic methods for determining full cash value: (1) the market data method (see Ehrman & Flavin, *supra,* §§ 314-319; State Board of Equalization, Assessors' Handbook—General Appraisal Manual (2d ed. 1962) pp. 93-101 (hereinafter cited as Assessors' Handbook); Cal. Admin. Code, tit. 18, § 4); (2) the income method (see Ehrman & Flavin, *supra,* §§ 300-313; Assessors' Handbook, *supra,* pp. 60-91; Cal. Admin. Code, tit. 18, § 8); and (3) the cost method (see Ehrman & Flavin, *supra,* §§ 292-299; Assessors' Handbook, *supra,* pp. 45-58; Cal. Admin. Code, tit. 18, § 6).

Under the market data method the assessor examines and correlates the prices resulting in other transactions involving comparable properties (see, e.g., *Georgia-Pacific Corp.* v. *County of Butte, supra,* 37 Cal.App.3d 461, 472); the validity of this method rests upon the assumption that comparable properties have comparable full cash values. The absence of reliable market data concerning property of the same age and condition renders the market data method only marginally useful in appraising personal property such as that here in question.

Under the income method the assessor capitalizes the sum of future income attributable to the property, less an allowance for the risk of partial or no receipt of income (see, e.g., *De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546). The income method rests upon the assumption that in an open market a willing buyer of the property would pay a willing seller an amount approximately equal to the present value of the future income to be derived from the property. Since it is impracticable to attribute specific income to the type of property here in question the income method does not easily lend itself to the appraisal here before us.

Out of substantial necessity, then, the assessor in this case resorted to the so-called cost method, under which the assessor subtracts depreciation from a figure reflecting cost. (See Cal. Admin. Code, tit. 18, § 6.)[6]

---

[6] As indicated above, the "cost" figure utilized by the assessor in this case was original acquisition cost, unaffected by other factors such as price-level fluctuations. The cited section 6 of the new state board regulations, which is not specifically applicable to this case (see fn. 5, *ante*), requires that assessment on the cost basis now be keyed to current reproduction or replacement costs, which are in turn subject to depreciation due to physical deterioration and certain other factors.

██ It is clear, of course, that the use of cost factors as the basis of a scheme for determining full cash value of assessed property is not intrinsically arbitrary. (See *Michael Todd Co.* v. *County of Los Angeles* (1962) 57 Cal.2d 684, 697-698 [21 Cal.Rptr. 604, 371 P.2d 340]; *Kaiser Co.* v. *Reid, supra,* 30 Cal.2d 610, 623; *Lockheed Aircraft Corp.* v. *County of L. A.* (1962) 207 Cal.App.2d 119, 128-129 [24 Cal.Rptr. 316].) It is equally clear that most property declines in value throughout its useful life, and consequently a cost-less-depreciation valuation method may, in many instances, indicate accurately the amount "that property would bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other." (*De Luz Homes, Inc.* v. *County of San Diego, supra,* 45 Cal.2d 546, 562.) Such a method, however, if it is to yield results consistent with the constitutional command that all property subject to taxation be assessed at full cash value, must be designed so that cost factors, which by their nature can have no *direct* relationship to present value, are modulated by depreciation factors in a manner reasonably calculated to achieve an approximation of such value with respect to the individual taxpayer. (See *Michael Todd Co.* v. *County of Los Angeles, supra,* 57 Cal.2d 684, 697-699.)

██ We have concluded that the method of valuation utilized by the assessor in the case before us—which purports to arrive at full cash value by discounting original acquisition cost by a uniform "depreciation factor" of 50 percent for all properties, regardless of age or condition— wholly fails in this respect, for it effectively abandons any attempt to distinguish among individual properties with respect to their then current value. The "depreciation factor" in this case amounts to nothing more than a halving of the assessment ratio—so that the total effect of the scheme is that business personal property (excluding inventory) is uniformly taxed at 25 percent of its original acquisition cost.[7] The trial court held, and we agree, that such a method is arbitrary, in excess of the assessor's discretion, and in violation of constitutional and legislative requirements that all property subject to taxation be assessed at its full cash value.

---

[7] According to the testimony of defendant's deputy assessor. Paizis. who was in charge of the so-called *Knoff* mandate assessment program. the uniform "depreciation factor" was applied on the assumption that. on the average. all personal property in the city was "half-used." The figure chosen. according to Paizis. was an "arbitrary" one.

In fairness to the present assessor. we note that the procedure in question was not without precedent in assessment practices and had been in use in San Francisco for many years prior to his taking office in May of 1966—which was two months after the issuance of the *Knoff* mandate. As indicated above (fns. 5 and 6, *ante*) the system in question has not been in use in San Francisco since 1967.

██

Our decision in *Mahoney* v. *City of San Diego, supra,* 198 Cal. 388, provides an instructive parallel. There the assessor assessed improvements on real property separately from the real property itself; in so doing he took initial construction cost for old and new buildings alike, discounting that figure by a fixed percentage according to the type of structure. .Thus frame and stucco buildings were valued at 15 percent of their initial construction cost, brick or tile at 20 percent, and concrete at 25 percent—all without regard to age, location, or actual condition. This method, we concluded, could not be upheld: "We do not say that in assessing improvements upon real estate the elements of age, state of repair, location, cost of construction or of replacement are or that any one of them is controlling upon the assessor in the exercise of his judgment and discretion as to what valuations he shall place upon assessable improvements upon real estate; but what we do hold is that an assessment made by an assessor in accordance with a systematic and intentionally adopted theory for the arrival at valuations to be placed upon that form of property which omits to take into consideration any of the foregoing elements which in common experience ordinarily determine values, and in place thereof substitutes an arbitrary basis for the fixation of values upon the several classes of such form of property for purposes of assessment upon a percentage plan, from which the foregoing elements for determining values are expressly excluded, will not be upheld when it sufficiently appears that actual discrimination has resulted from an assessment thus arrived at." (198 Cal. at p. 402.)

The method of assessment utilized in the instant case suffers from the same defect as that involved in *Mahoney*. The assessor's chief personal property auditor testified that due to the lack of financial resources in the assessor's office and the time limitations imposed by the *Knoff* mandate it was not possible to conduct a physical inventory of all personal property of the taxpayers subject to the mandate, and that therefore a less cumbersome method of assessment was here necessary. This we freely grant; we also recognize that in assuming the duties of his office subsequent to the issuance of the *Knoff* mandate the present assessor was faced with grave and urgent responsibilities which had the practical effect of precluding any immediate reexamination of a method of assessment which had been in use in the City and County of San Francisco for a substantial period of time. (See fn. 7, *ante.*) These considerations, however, cannot dissuade us from a proper resolution of the legal issue presented in this case. While we have recognized that the magnitude of an assessor's duties requires the adoption of certain formulas of depreciation and other factors facilitating the determination

of full cash value of assessed property without the necessity of physical inventory (see *Rittersbacher* v. *Board of Supervisors, supra,* 220 Cal. 535, 543)[8] such aids exceed the limits of their permissible use when they cease to perform any realistic function toward the end of carrying out the constitutional and statutory command that all property subject to taxation be assessed at its full cash value. The formula adopted in the instant case, which purports to determine full cash value by the simple expedient of applying a uniform discount to acquisition cost, wholly abandons any attempt to achieve a reasonable estimate of the true present value of the property to which it addresses itself.[9] It is for this reason invalid.

## IV

### DEFENDANT'S OTHER CONTENTIONS

■ It is further contended that plaintiff is not entitled to a refund of taxes levied under the 1967 escape assessment because it comes to court without clean hands, in that its 1964 and 1965 tax returns were submitted in blank and its 1966 return understated the amount of cash on hand. Even assuming, however, that these occurrences resulted in formal noncompliance with the requirements of the law governing the reporting

---

[8]Defendant's extensive reliance on our *Rittersbacher* decision is largely unjustified. There the issue as stated by us was whether "the rules prescribed and methods pursued by the assessor" in assessing various classes of *personal property* "were so unlawful, discriminatory and inequitable as to constitute a constructive fraud on the owners of *real estate.*" (220 Cal. at p. 545: italics added.) In concluding that they were not, we pointed out that whereas real property was assessed on the basis of an individual evaluation of fair market value, such was not possible in the case of personal property, as to which certain formulas for depreciation of original cost were utilized to determine fair market value. Although it appears that certain of the formulas to which we adverted involved fixed-percentage depreciation of the type here involved, it must be emphasized that the issue in that case was one of discrimination between real estate taxpayers and personal property taxpayers and that the matter of discrimination among personal property taxpayers *inter se* was not there before us.

It is also notable that in *Rittersbacher* we were applying the pre-*De Luz* standard of review (see part II. *ante*). Under that standard, we noted, an assessment was not to be adjudged invalid "except upon a clear showing of 'fraud or something equivalent of fraud' on the part of the assessing authorities such as appearing in *Mahoney* v. *City of San Diego, [supra]* 198 Cal. 388 . . . ." (220 Cal. at p. 542.)

[9]According to testimony before the trial court, the method here in question was applied on the assumption that "on the average" all taxable personal property in San Francisco is "half-used." Accepting such an assumption as true—i.e.. that taking all such personal property in the aggregate and computing the average percentage of useful life attained, that figure will come out in the neighborhood of 50 percent—the fact remains that converting that statistic into an assessment formula necessarily entails the further assumption that the property of all or most taxpayers will reflect the same average. The latter assumption is contrary to reason and experience and must be termed absurd.

of taxable assets, we do not believe that they were of such a character as to foreclose plaintiff from the relief it here seeks. All such deficiencies in plaintiff's property statements were remedied by subsequent audits by defendant, and there was no showing at trial of any improper motive. "It is not every wrongful act, nor even every fraud, which prevents a suitor in equity from obtaining relief. His misconduct must be so intimately connected to the injury of another with the matter for which he seeks relief, as to make it inequitable to accord him such relief." (*Bradley Co.* v. *Bradley* (1913) 165 Cal. 237, 242 [131 P. 750].)

It is also asserted that plaintiff may not here challenge the depreciation formula here adopted because this ground was not specified in its protest. (See Rev. & Tax. Code, § 5139, subd. (b).) Suffice it to say that we find the following specification in plaintiff's protest to be adequate for these purposes: "Contrary to the statutory and constitutional requirements the assessor has illegally and arbitrarily used a cost formula rather than market value to determine full cash value and as a result the values before equalization far exceed the full cash values."

■ Defendant also contends that plaintiff's claim should be denied because plaintiff did not offer evidence of discriminatory overvaluation of its property and undervaluation of someone else's property. Although there is language in certain opinions which would suggest that this burden, which obtains in cases challenging an individual application of a *proper* assessment method (see *Simms* v. *County of Los Angeles* (1950) 35 Cal.2d 303, 311-312 [217 P.2d 936]), obtains as well in cases in which the assessment method is "wrong" (see, e.g., *Eastern-Columbia, Inc.* v. *County of L.A.* (1945) 70 Cal.App.2d 497, 505 [161 P.2d 407]), we think it manifest that the indicated showing is not necessary in a case such as this wherein the assessment method used wholly fails to conform to constitutional provisions requiring assessment at full value. In any event the discrimination which results from defendant's valuation method is plain: taxpayers owning predominately new property necessarily pay less than they should, and those owning old property necessarily pay more. To say in these circumstances that no discrimination exists because all taxpayers are treated alike is to espouse a strange kind of equality—an "equality" clearly forbidden by our state constitutional requirement of assessment at full value. By the same token, to require a taxpayer in such circumstances to go beyond a showing of substantial overassessment of its own property and show a similar underassessment in others would be to demand a useless act. (See *Mahoney* v. *City of San Diego, supra,* 198 Cal. 388, 402-403.)

■ Finally, defendant contends that the trial court should have transferred the case to the department which had issued the *Knoff* writ of mandate and which had reserved jurisdiction over the collection of taxes pursuant to the writ. Defendant did not object to this alleged irregularity until the appeal; therefore, the only question before us is whether the judgment of the trial court is void because the court exceeded its jurisdiction. In *Williams* v. *Superior Court* (1939) 14 Cal.2d 656, 662-663 [96 P.2d 334], the court stated that "jurisdiction is vested by the Constitution in the court and not in any particular judge or department thereof; and . . . whether sitting separately or together, the judges hold but one and the same court. . . . [I]f one department of a court exercises authority in a matter which might properly be heard in another, the action constitutes at most an irregularity and does not affect the jurisdiction." *Williams* accurately states the law on this question. Unless the action of one judge is necessarily incompatible with the prior action of another judge (see, e.g., *In re Kowalski* (1971) 21 Cal.App.3d 67 [98 Cal.Rptr. 444]), the action of the former cannot be attacked for the first time on appeal.

The judgment is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Richardson, J., concurred.

Appellant's petition for a rehearing was denied March 10, 1976, and the opinion was modified to read as printed above.