[No. B009324. Second Dist., Div. Three. Nov. 30, 1987.]

MAY DEPARTMENT STORES COMPANY, Plaintiff and
Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

756

COUNSEL

De Witt W. Clinton, County Counsel, and Paula A. Snyder, Deputy County Counsel, for Defendants and Appellants.

Donald L. Clark, County Counsel (Santa Clara), and Thomas Wm. Cain, Deputy County Counsel, as Amici Curiae on behalf of Defendants and Appellants.

Rodi, Pollock, Pettker, Galbraith & Phillips and John D. Cahill for Plaintiff and Appellant.

Ehrman, Flavin, Devine & Baker, Paul W. Baker and Fred Main as Amici Curiae on behalf of Plaintiff and Appellant.

OPINION

KLEIN, P. J.—Defendants and appellants County of Los Angeles (County or Assessor), its tax collector, H. B. Alvord, and certain cities on behalf of which the County collects taxes, appeal those portions of a judgment entered in favor of plaintiff and appellant the May Department Stores Company (the May Company).

The May Company cross-appeals as to the portion of the judgment favorable to the County.

Because the trial court: (1) incorrectly ruled the Assessor had taxed the carpeting in the May Company's stores as both structure and personal property; (2) improperly required the Assessor to consider the effect of investment tax credit (ITC) when determining full cash value of taxable property; and (3) erroneously disapproved the depreciation method applied to the May Company's point-of-sale (POS) equipment, the judgment must be reversed in part.

FACTUAL AND PROCEDURAL BACKGROUND

The May Company applied to the County's assessment appeals board (Board) for a reduction of property taxes paid in the years 1975, 1976 and

1977.[1] After four days of evidence, the Board upheld both the Assessor's valuation method and valuation of the May Company's property, and the taxes based thereon. The May Company presented five issues of alleged overassessment to the Board: 1. Supplies/inventory: The May Company contended certain of its price tags, price tickets, sales checks, cash register tapes and other similar items had been misclassified as supplies rather than inventory;

2. Carpeting: The May Company believed the Assessor had taxed the carpeting in the May Company's department stores twice, once in the income approach to valuation used to appraise the land and building and again as personal property;

3. ITC: The Assessor refused to consider ITC when calculating the fair market value for assessment purposes of the May Company's furniture and equipment. The May Company contended the Assessor's inclusion in the fair market value of all costs required to place an asset into service mandates that reductions in cost, such as ITC, also be taken into account;

4. POS equipment: The May Company claimed the depreciation method applied by the Assessor to certain POS equipment did not accurately reflect the limitations of the equipment or its purported near immediate obsolescence;

5. Abandoned property formula: The May Company found the reported value of the fixtures in its older stores had never been reduced for items, such as display cases, which had been taken out of service. In order to correct this asserted over reporting, the May Company devised a formula which estimated the cost of fixturizing a store. It sought to replace the previously reported value of the fixtures with the value derived by application of the formula. The Assessor accepted the abandoned property formula for the year 1977 but not for 1975 or 1976.

In June 1982, the Board found in favor of the Assessor on each issue and denied the May Company's application.

In May 1983, the May Company filed a complaint in the superior court for a refund of the taxes paid on the five issues.

The trial court upheld the Assessor on the lost and abandoned property formula issue, but overturned the decision of the Board on the other four issues and found in favor of the May Company.

---

[1] The Assessor's imposition, in 1979, of escape assessments on the May Company's real and personal property for the years 1975, 1976 and 1977 permitted the May Company to reopen each of those tax years. (Rev. & Tax. Code, § 469.)

In the process, the trial court did not review the record of the proceedings before the Board, and instead admitted evidence on all issues, thereby conducting a trial de novo.[2]

## CONTENTIONS

The County contends the trial court should not have conducted a trial de novo on the issues presented but should have looked only to the record of evidence presented before the Board. The County also claims the trial court erred in determining the supplies/inventory, POS equipment, carpeting and ITC issues in favor of the May Company.

The May Company cross-appeals the trial court's ruling in favor of the Assessor as to the abandoned property formula.

## DISCUSSION

1. *Standard of review.*

■ "The actions of the [Assessor] are clothed with a presumption of correctness and regularity. They will not be disturbed if there is substantial evidence in the administrative record to support them. [Citations.]" (*Jones* v. *County of Los Angeles* (1981) 114 Cal.App.3d 999, 1003 [170 Cal.Rptr. 879].)

"[T]o prevail at trial, and on appeal, for want of substantial evidence to support the board's decision, the taxpayer must have overcome the presumption of correctness of the assessment by presenting to the board evidence of assessment impropriety." (*ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 252 [162 Cal.Rptr. 186].)

■ "If the [taxpayer] claims only that the [A]ssessor and the Board of Equalization erroneously applied a valid method of determining full cash value, the decision of the board is equivalent to the determination of a trial court, and the trial court in turn may review only the record presented to the board. [Citations.] The trial court may overturn the board's decision only when no substantial evidence supports it, in which case the actions of the board are deemed so arbitrary as to constitute a deprivation of property

---

[2] We have taken judicial notice of the superior court file as well as the transcript of the record presented before the Board. We note the opposition of the May Company to such notice with respect to the proceedings before the Board.

without due process. [Citations.] *On the other hand, when the taxpayer challenges the validity of the valuation method itself, the trial judge is faced with a question of law.* [Citations.] That question, . . . , is whether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law." (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354], italics added.)

Similarly, "[i]f the action merely questions the propriety of the board of equalization's refusal to correct an erroneous assessment, the court cannot try de novo the question of any alleged overvaluation, but is limited to a consideration of the proceedings before the board. [Citations.] Where the action involves a question of legality or constitutionality of the assessment and not a question of valuation, the court can try de novo the question presented to it. [Citations.]" (*Pacific Grove-Asilomar Operating Corp.* v. *County of Monterey* (1974) 43 Cal.App.3d 675, 681 [117 Cal.Rptr. 874].)

2. *Propriety of trial de novo.*

■ Applying these principles to the issues presented here, it appears each of the five issues, on its face, presents a question of law, or at least a mixed question of law and fact. The proper classification of assets, as in the inventory versus supply issue, is a question of law, not value. Whether the Assessor's appraisal method doubly taxed the May Company's carpeting, as well as the significance to be accorded ITC, are also issues of law. (*Georgia-Pacific Corp.* v. *County of Butte* (1974) 37 Cal.App.3d 461, 474 [112 Cal.Rptr. 327].) Application of the abandoned property formula and the propriety of the method of depreciating POS equipment, again, present questions of *methodology* not *valuation* and therefore were the proper subjects of trial de novo in the superior court.

However, whether the trial court was also free to disregard the record of evidence presented to the Board depends upon whether the trial court resolved the particular issue as one of fact or as one of law. If the former, the trial court must consider the evidence presented to the Board. (*Hunt-Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163, 179 [116 Cal.Rptr. 160].)

### 3. *Supplies v. inventories.*[3]

■ For the tax years in question, business inventories enjoyed a 50 percent exemption from taxation. The Assessor classified the May Company's price tags, price tickets, sales checks, cash register tapes, restaurant paper goods such as paper or styrofoam cups, napkins, placemats, straws, doilies, paper trays, gift boxes, wrapping paper and twine as supplies.[4] The Board agreed with the Assessor, approving the classification of these items as supplies, thereby rendering them ineligible for the 50 percent exemption.

The trial court reversed the Board and reclassified all of these items as inventory.

Revenue and Taxation Code section 129 defines " 'business inventories' " as "goods intended for sale or lease in the ordinary course of business and shall include raw materials and work in process with respect to such goods."

Title 18, California Administrative Code, section 133(a)(1) expands upon this definition by including "containers or container material such as kegs, bottles, cases, twine and wrapping paper, whether returnable or not, if title thereto will pass to the purchaser or lessee of the product to be sold or leased therein."

The State Board of Equalization Handbook 571-55, exhibit 4, admitted into evidence at trial without objection states: "[S]upplies are not considered business inventories. [Fn. omitted.] Supplies are auxiliary materials that may be consumed in the operations of the company but are not embodied in or delivered with the product itself. Examples of supplies are sandpaper, drill bits, chemicals used to produce a chemical reaction, and any other items not becoming an ingredient or component part of the product to be marketed."

The May Company's divisional vice president of tax management testified the items in issue were either entirely delivered to a customer upon the purchase of merchandise, or, in the case of three-part sales tickets or two-part register tapes, were partially delivered to the customer.

The trial court reclassified the items, or those portions of the items delivered to the customer, as inventory since title passed to the customer upon sale.

---

[3] All evidence included in each of the following discussion sections is summarized from the proceedings before the trial court only unless otherwise indicated.

[4] The County concedes in its opening brief that paper cups and napkins are properly inventory.

Because the price tags and sales receipts in issue are delivered to the customer with the merchandise purchased, we agree with the trial court's ruling that, as a matter of law, these items are more properly classified as inventory rather than supplies. Therefore, the trial court's ruling on this issue is affirmed.

### 4. *Carpeting.*

■ The May Company claimed the Assessor doubly taxed the carpeting in its stores as both part of the structure and as personal property.

Regarding the proper classification of carpet as a fixture or personalty, the Assessor admits carpeting is a fixture, and therefore part of the structure. However, the chief appraiser in the Assessor's personal property division explained the practice of appraising carpet as personal property developed because of frequent double assessment to both a renter and an owner of a building. Therefore, the Assessor assessed and taxed carpeting only once as personal property.

■ As to the method employed to determine the value of the May Company's stores, expert appraisers for each side explained the income approach method to value used. Simply stated, this method consists of deriving a value for the land and structure by applying a land and structure cost factor to the stabilized gross sales volume of the store.

■ The Assessor claimed this income method of appraising the May Company's stores eliminated carpet, as well as all other fixtures and amenities, from the value attributed to the land and structure. The Assessor's real estate appraiser who developed this technique reiterated this method's ability to exclude amenities, fixtures and carpeting from value, thereby permitting its use regardless of whether a store has plush or spartan amenities.

Another real property appraiser for the Assessor also testified the method of appraising a department store's land and building does not include carpet although carpet could be included simply by increasing the land and structure cost factor applied to the gross sales figure by a small amount. The same appraiser also specifically stated the reference to carpeting in appraisal reports constitutes only a building description, not an itemization of what had been appraised.

The trial court did not disapprove the income method of valuing the May Company's stores but found the "land and structure cost factor concerning 12 of [the May Company's] stores was reached by [the Assessor] through a

physical survey of each of said 12 buildings (see [exhibits] #'s 23-34) and valuation. The survey of each of the 12 buildings included carpeting as a part of each structure; there is no evidence that at any time the carpet component of the described structure was deleted or disregarded. Thus, the [Assessor] has included carpeting as a part of each structure of [the May Company] of which there is an appraisal record in evidence. To then include the value of that same carpeting among the fixtures assessed by [the Assessor] constitutes prohibited double taxation."[5]

■ Because review of the appraisal technique used to value the land and structure of the May Company's department stores is clearly an issue of law (*Georgia-Pacific Corp.* v. *County of Butte, supra,* 37 Cal.App.3d at p. 474), the trial court properly examined this methodology in the context of a trial de novo.

■ However, the trial court did not base its ruling upon a disapproval of the income appraisal technique. On the contrary, the trial court approved the technique and found the Assessor's capitalized income approach could eliminate adequately all value attributable to a department store except land and building. The trial court concluded, as a matter of fact, the Assessor had not done so. The trial court based this finding solely upon the inclusion of carpeting in the building description section of the Assessor's reports. The Assessor claimed, before the Board and at trial, that this section is intended merely as a description of the building.

Nonetheless, the trial court disregarded the Board's finding, thereby improperly substituting its view of the facts for the Board's.

Once the trial court determined the method of appraisal to be valid, the first part of the *Bret Harte Inn* rule should have been applied. Specifically, "[t]he trial court may overturn the board's decision only when no substantial evidence supports it, in which case the actions of the board are deemed so arbitrary as to constitute a deprivation of property without due process. [Citations.]" (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 23.)

Because the record of evidence presented before the Board contained testimony that carpeting had been placed upon the audit records for descriptive purposes only, and because the Board found this evidence credible,

---

[5] The parties agreed the trial court's tentative decision, filed June 21, 1984, would act as its statement of decision.

the trial court was obliged to affirm the finding of the Board on this issue. Accordingly, the trial court's ruling on this issue must be reversed.[6]

5. *The ITC.*[7, 8]

██ The question here presented is whether it was arbitrary for the Assessor not to consider ITC when assessing the full cash value of personal property. The California Constitution provides that all property is taxable and shall be assessed at the same percentage of its fair market value. (Cal. Const., art. XIII, § 1.) It is the obligation of the Assessor to assess annually all taxable property in the County at its full cash value. (Rev. & Tax. Code, §§ 401, 405.) ██ Full cash value is the price property would bring on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. (*De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 566 [290 P.2d 544]; Rev. & Tax. Code, § 110.)

In determining full cash value, the Assessor requires the May Company to report the total cost of acquisition of its capital assets as the taxable value of the property. This cost includes all out-of-pocket expenses such as freight, installation charges, sales and use tax, et cetera. However, the Assessor reduces the taxpayer's cost by the amount of any discounts or rebates.

This cost of acquisition is the starting point for determining the replacement cost new less depreciation which provides the taxable or full cash value of an asset in any given year after its purchase. Replacement cost new less depreciation is computed by trending the cost of the asset for inflation, usually upwards, to arrive at a replacement cost. The replacement cost is then depreciated to arrive at a current fair market value. Both steps are accomplished by use of a "fair market multiplier" or trending factor.

---

[6] By letter filed after oral argument, the May Company has called our attention to the case of *El Toro Dev. Co.* v. *County of Orange* (1955) 45 Cal.2d 586 [290 P.2d 569]. In that case the Supreme Court found the Assessor's use of a capitalization of income approach to valuation of an apartment complex had resulted in the double taxation of refrigerators, ranges and garbage disposal units. The difference between *El Toro* and the present case is clear. In *El Toro,* the gross income stream attributable to the apartment units was capitalized to arrive at a value for the entire complex. (*Id.,* at p. 588.) In the present case, the Assessor capitalized only the sales volume attributable to the land and structure, thereby eliminating all but those assets from the value figure obtained.

[7] By enactment of the Tax Reform Act of 1986, Congress terminated, with certain exceptions and transitional rules, the investment tax credit for all property placed in service after December 31, 1985. (26 U.S.C. § 49.)

[8] The parties have brought to our attention several written decisions rendered by California trial courts on this issue. However, no published opinion treats with whether ITC works to reduce the fair market value of an asset for property tax purposes.

██ The May Company claims ITC, which reduces the effective cost of an asset, should also be taken into account by the Assessor when determining replacement cost new less depreciation. The May Company argues no knowledgeable purchaser would buy used equipment for more than its cost new less the available ITC. Therefore, replacement cost should never exceed this amount. For the tax years in issue the May Company was eligible for and took ITC on its purchases of qualifying property.

The trial court found the Assessor abused its discretion in failing to reduce the value of the May Company's furniture and equipment by the amount of the ITC attributable to the property. It stated: "It is clear that new equipment purchased by [the May Company] in the target years and which qualified for an I.T.C. never could have a market value of more than 93 percent of its sales price. [In 1975 ITC was only 7 percent.] That is, the equipment once received by the purchaser could not be resold to an 'informed buyer, being under no compulsion to buy' (*Xerox* [*Corp.* v. *County of Orange* (1977) 66 Cal.App.3d 746,] p. 753), for more than 93 percent of its list price new, for the prospective purchaser himself [*sic*], if positioned to take advantage of the I.T.C., actually would pay for a new machine for no more than its list price less the I.T.C. available to him [*sic*]. Thus, there seems to be no question but that the I.T.C. affects fair market value of the equipment, and hence should be considered by the [Assessor] when it appraises the fair market value (or 'full cash value') of the piece."

There is no question that, as a practical matter, a business such as the May Company takes ITC into account when determining whether to acquire a capital asset. However, ITC is not something bargained for between the parties; it is a federal income tax consideration which varies from taxpayer to taxpayer. Congressional intent was to provide a credit against federal income tax liability—not a valuation tool for state property tax consideration. Full cash value of any given asset is not affected by the particular tax position of a prospective purchaser.

The trial court relied upon *Xerox Corp.* v. *County of Orange* (1977) 66 Cal.App.3d 746 [136 Cal.Rptr. 583]. That case upheld the Assessor's inclusion of sales tax as an element of full cash value regardless of whether the taxpayer owns the asset and actually paid the sales tax or only leases it and hence has never paid it. (*Id.,* at pp. 758, 760.)

By a parity of reasoning, one might conclude, as the trial court did, that if sales tax must be taken into account in determining full cash value, tax credits should also be considered. Adding impetus to this erroneous conclusion is the Assessor's conceded reduction of taxable value by the amount of

rebates and discounts. While these arguments are initially persuasive, they do not withstand close scrutiny.

Although several considerations persuade us the Assessor acted properly in refusing to consider the May Company's ITC in determining property tax values, the most compelling of these is the possibility a taxpayer, by reason of premature disposal of the property, may have to repay or "recapture" some or all of the ITC. (See 26 U.S.C. § 47.)

This difference distinguishes ITC from both sales tax and rebates, both of which are imposed or available upon the use or purchase of property. Neither sales tax nor a rebate depends upon a holding period in order to determine its amount of the tax with certainty.

Further, neither rebates nor sales tax are dependent upon the individual tax situation of the purchaser or user. On the other hand, ITC is subject to many limitations and qualifications as even the briefest examination of the federal tax laws will suggest.

Putting aside these distinctions, the trial court's analysis also overlooks the availability of ITC on the purchase of some used property as well as new acquisitions. (See 26 U.S.C. §§ 46 (c)(1)(B), 48 (c)(1).) Thus, even accepting the trial court's analysis, the replacement cost new of an asset would not be its cost new less the available ITC but cost new less ITC *plus* the ITC available on used property.

Additionally, the taxpayer has the ability to vary ITC by making certain basis adjustment elections. That is, if a taxpayer takes a full ITC on qualified property, the depreciable basis of the property is reduced by 50 percent of the credit. However, if the taxpayer is willing to take a reduced ITC, no such reduction in the basis of the asset occurs. (See 26 U.S.C. § 48 (q).)

Also, while the purchaser of property qualifying for ITC may take it into account when making the decision to purchase, ITC is not bargained for between purchaser and seller. It is an independent incident of federal tax law, the availability, amount and possible recapture of which are subject to a huge body of federal law and regulation.

Unlike the uniform 50 percent depreciation schedule denounced in *Bret Harte Inn,* the Assessor's refusal to take ITC into account is not a "simple expedient" which "wholly abandons any attempt to achieve a reasonable estimate of the true present value of the property." (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 27.) Rather, the effect of ITC on market value of an asset is so ephemeral and difficult to determine with certainty that the Assessor need not consider it.

The May Company would have us ignore these myriad complexities and find ITC no different than a rebate which is not realized until some time after the sale. The ITC is so substantially different from both a rebate and sales tax that the Assessor did not act arbitrarily in refusing to take it into account.

Because of the seemingly unending difficulties encountered in any analysis of the federal tax laws, we hold ITC need not be taken into account by the Assessor in determining fair market value. Therefore, the trial court's ruling on this issue must also be reversed.

### 6. *POS equipment.*

The May Company acquired the manufacturer of the POS equipment in issue in order to market the machines which gathered POS information and acted as a cash register. However, the equipment, called the Mark 2000, was not a flexible terminal system, could not be programmed and had only read-out memory. In 1974, the May Company realized the equipment had become outdated and terminated the project. It entered into an agreement with TRW by which TRW took over production of the POS equipment the May Company had promised to deliver and TRW began development of a new terminal.

The May Company transferred the existing Mark 2000's to its east coast stores on the assumption two of the machines would work and a third would be used for parts. All the Mark 2000's in California were replaced by the TRW machines by 1977. However, as of the trial date, the Mark 2000's were still in use in the May Company's east coast stores.

### a. *Six-year life.*

The Assessor depreciated the Mark 2000 on a six-year straight-line basis with a minimum 40 percent good.[9] An employee of the Assessor testified the six-year straight-line depreciation method had been adopted because in 1975 IBM introduced new models every five or six years.

The chief appraiser of the Assessor's personal property division testified mechanical cash registers are valued at replacement cost new less deprecia-

---

[9] Title 18, California Administrative Code, section 6, subdivision (e) defines percent good as follows: "Reproduction or replacement cost shall be reduced by the amount that such cost is estimated to exceed the current value of the reproducible property by reason of physical deterioration, misplacement, over- or underimprovement, and other forms of depreciation or obsolescence. The percentage that the remainder represents of the reproduction or replacement cost is the property's percent good." In lay terms, percent good appears to be the minimum value to which an asset may be depreciated.

tion and were usually depreciated over 12 years. The May Company's POS equipment, like computers and electronic cash registers, is only depreciated, that is, the taxable value is not derived by first trending the cost of the asset upwards to account for inflation. The Assessor decided to depreciate the POS equipment over six years because that life had been used for computers and is still used for electronic cash registers. The chief appraiser believed this life appropriate for the equipment at the time of valuation when it was new or one year old.

Regarding the claimed obsolescence of the POS equipment, the chief appraiser asserted the Assessor does not change the assessed value attributable to equipment in one year, if, in a later year, the property is less valuable. The property is assessed as of the lien date.

b. *40 percent good.*

For the tax years in question, former title 18, California Administrative Code, section 6, subdivision (f) provided: "If the [A]ssessor adopts a practice of depreciating property to minimum percent good, that minimum may be any percentage up to but no higher than 25 percent of reproduction or replacement cost new."

An appraiser employed by the Assessor explained that POS equipment, like computers, are not valued at replacement cost new less depreciation which involves both depreciation and a trending, usually upwards, for inflation, but are only depreciated. Therefore, although the 40 percent good for POS equipment, on its face, appears to run afoul of former title 18, California Administrative Code, section 6, subdivision (f), a 40 percent minimum good for depreciated equipment is actually less than a 25 percent minimum good for equipment valued at replacement cost new less depreciation.

c. *The trial court's ruling.*

The Board approved the Assessor's method of depreciation. However, the trial court found it arbitrary, stating the "depreciation schedule [for POS equipment] was simply carried over from computers without any attempt to make a study of the POS market. . . . [¶] . . . . [¶] . . . The taxpayer is entitled to have the [Assessor] reasonably informed on the matter of depreciation of POS equipment concerning both the annual rate and the 'good' when applying depreciation rates, and the [Assessor's] failure to so inform itself here made its imposition of the subject schedule arbitrary and abusive of his [*sic*] discretion."

Further, the trial court indicated its opinion the Assessor's depreciation schedule should "have the appearance of complying with" the maximum 25 percent good rule of the Board of Equalization.

d. *Appellate review of an issue of law.*

 Although the trial court resolved this issue as one of law, that ruling may be reviewed again on appeal. (*Briarwood Properties, Ltd.* v. *City of Los Angeles* (1985) 171 Cal.App.3d 1020, 1028 [217 Cal.Rptr. 849].)

 The Assessor is not required to conduct surveys before deciding upon a depreciation method. The only requirement for such a method is that it be reasonable. (*Texaco, Inc.* v. *County of Los Angeles* (1982) 136 Cal.App.3d 60, 63 [186 Cal.Rptr. 16].) Given that mechanical cash registers, which are valued at replacement cost new less depreciation, are depreciated over 12 years, it does not seem unreasonable or arbitrary for the Assessor to use a 6-year life for electronic cash registers, electronic equipment, computers and POS machines, which are not valued at replacement cost new less depreciation but simply depreciated.

Furthermore, the Mark 2000's were still in use in the May Company's east coast stores at the time of trial in 1984. Moreover, even if the equipment had been rendered totally obsolete shortly after its acquisition, value as of the lien date is determinative for any particular year. If the May Company had evidence of obsolescence after the lien date, that would affect only future property tax evaluations.

Regarding former title 18, California Administrative Code, section 6, subdivision (f), the maximum 25 percent good required by that rule applies only to assets valued at replacement cost new less depreciation. As the value of POS equipment is not inflated then depreciated as are replacement cost assets, the 40 percent good applied to POS equipment is uniformly lower than the former section 6, subdivision (f) limit for replacement cost new less depreciation assets. The difference in the two methods of valuation, replacement cost new less depreciation versus depreciation, adequately explains the discrepancy in the percent good allowable as to each.

As this is an area in which the Board has special expertise, the trial court should have deferred to its ruling absent arbitrary or unreasonable conduct by the Assessor.

"[The Board] found that the method used by the [A]ssessor here was a reasonable method for determining the difficult evaluation involved. The law requires only that an [A]ssessor adopt and use a reasonable method—

neither a trial court, nor this court, can reject a method found by the [B]oard to be reasonable merely because, in our nonexpert opinion, another method might have been better. [Fn. omitted.]" (*Texaco, Inc.* v. *County of Los Angeles, supra,* 136 Cal.App.3d at p. 63.)

Therefore, the trial court improperly disapproved the depreciation method applied by the Assessor to the May Company's POS equipment and its ruling on this issue is reversed.

### 7. *Abandoned property.*

In 1977 the May Company discovered it had over-reported the value of the fixtures in its older stores for some time. The problem arose because the cost of fixtures in the older stores had never been reduced to reflect replaced or abandoned equipment. For example, a display case purchased in 1939 remained on the property tax records in 1975 even though that case had long ago been replaced by a new one.

The May Company's abandoned property formula attempted to correct this error by estimating the cost of fixturizing a new store and applying that rate to the older stores, thereby approximating the proper value of fixtures to be reported on the property tax statement for that store.

The Assessor accepted the formula for the tax year 1977, the first year in which it was presented, because it could be verified by a physical survey of the fixtures in question. It rejected the formula for prior tax years because no survey for those years was possible.

The trial court ruled in the Assessor's favor, finding its refusal to reclassify abandoned property for the years 1975 and 1976 was not an abuse of discretion. We agree. The taxing authority is not required to accept a valuation formula it has no way of verifying. Because the Assessor could not conduct a physical survey of the stores in question after the fact, the Assessor was justified in refusing to apply the abandoned property formula in those years.

Therefore, the trial court's ruling is affirmed on this issue.

### CONCLUSION

Because each of the issues presented involved, to varying degrees, questions of law, the trial court properly conducted a trial de novo. However, if the trial court resolves a mixed question of law and fact as one of fact, it must give the same deference to the Board's finding on questions of fact that a Court of Appeal accords the factual determinations of a trial court. Fur-

ther, this court may properly review the trial court's resolution of issues of law.

We agree with the trial court's reclassification of certain items as inventory and its ruling the Assessor need not accept a valuation formula it has no way of verifying.

Regarding carpeting, once the trial court resolved the methodology, i.e., the legal issue, in favor of the Assessor, it should have respected the Board's factual finding, supported by substantial evidence, that carpeting had been included in certain audit records for descriptive, not appraisal, purposes. Therefore, the trial court erred in substituting its finding of fact for the Board's, and its ruling in this respect must be reversed.

The trial court's determination that the Assessor must take the availability of ITC into account when determining replacement cost must also be reversed, primarily because ITC, unlike either rebates or sales tax, is subject to uncertainty arising out of the possibility of recapture.

Finally, we conclude the six-year straight-line depreciation method applied by the Assessor to the May Company's POS equipment was neither arbitrary nor an abuse of discretion and reverse the trial court's disapproval of this method.

## DISPOSITION

The judgment is reversed as to the carpeting, ITC and POS equipment issues; on the remaining issues, the judgment is affirmed. Each party to bear respective costs on appeal.

Danielson, J., and Arabian, J., concurred.